## NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION, INC. *v.* GULF POWER CO. ET AL.

No. 00–832.   Argued October 2, 2001—Decided January 16, 2002*

---

*Together with No. 00–843, *Federal Communications Commission et al.* v. *Gulf Power Co. et al.*, also on certiorari to the same court.

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, GINSBURG, and BREYER, JJ., joined, and in which SOUTER and THOMAS, JJ., joined as to Parts I and III. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which SOUTER, J., joined, *post*, p. 347. O'CONNOR, J., took no part in the consideration or decision of the cases.

*James A. Feldman* argued the cause for petitioners in No. 00–843. With him on the brief were *Solicitor General Olson, Acting Solicitor General Underwood, Acting Assistant Attorney General Nannes, Deputy Solicitor General Wallace, Robert B. Nicholson, Robert J. Wiggers,* and *Jane E. Mago. Peter D. Keisler* argued the cause for petitioner in No. 00–832. With him on the briefs were *Paul J. Zidlicky, Daniel L. Brenner, Neal M. Goldberg, David L. Nicoll, Paul Glist, John D. Seiver,* and *Geoffrey C. Cook. Anthony C. Epstein* and *William Single IV* filed a brief for Worldcom, Inc., respondent under this Court's Rule 12.6, in support of petitioners in both cases.

*Thomas P. Steindler* argued the cause for respondents in both cases. With him on the brief for respondents American

Electric Power Service Corp. et al. were *Shirley S. Fuji-moto, Christine M. Gill, J. Russell Campbell, Andrew W. Tunnell,* and *Ralph A. Peterson. Robert P. Williams II* and *Charles A. Zdebski* filed a brief for respondents Atlantic City Electric Co. et al. in both cases. *Jonathan L. Wiener* and *Neil Anderson* filed a brief for respondent TXU Electric Co. in both cases. *Jean G. Howard* filed a brief for Florida Power & Light Co., respondent in No. 00–843.†

JUSTICE KENNEDY delivered the opinion of the Court.

## I

Since the inception of cable television, cable companies have sought the means to run a wire into the home of each subscriber. They have found it convenient, and often essential, to lease space for their cables on telephone and electric utility poles. Utilities, in turn, have found it convenient to charge monopoly rents.

Congress first addressed these transactions in 1978, by enacting the Pole Attachments Act, 92 Stat. 35, as amended, 47 U. S. C. § 224 (1994 ed.), which requires the Federal Communications Commission (FCC) to "regulate the rates,

---

†Briefs of *amici curiae* urging reversal were filed for the Association for Local Telecommunications Services et al. by *Philip L. Verveer, Theodore Case Whitehouse, Joseph M. Sandri, Jr., Howard J. Symons,* and *Douglas I. Brandon;* and for the United States Telecom Association et al. by *William P. Barr, Michael E. Glover, Edward Shakin, Richard G. Taranto,* and *John W. Hunter.*

Briefs of *amici curiae* urging affirmance were filed for Real Access Alliance by *William Malone, Matthew C. Ames,* and *Clarine Nardi Riddle;* for the Site Owners and Managers Alliance of the Personal Communications Industry Association by *Dennis P. Corbett* and *H. Anthony Lehv;* and for the United Telecom Council et al. by *Jill Mace Lyon* and *Edward Comer.*

Briefs of *amici curiae* were filed for the Consumers Union et al. by *Cheryl A. Leanza, Andrew Jay Schwartzman,* and *Harold J. Feld;* and for Earthlink, Inc., by *John W. Butler, Earl W. Comstock,* and *David Baker.*

terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable." § 224(b). (The Act is set forth in full in the Appendix, *infra*.) The cases now before us present two questions regarding the scope of the Act. First, does the Act reach attachments that provide both cable television and high-speed (broadband) Internet service? Second, does it reach attachments by wireless telecommunications providers? Both questions require us to interpret what constitutes a "pole attachment" under the Act.

In the original Act a "pole attachment" was defined as "any attachment by a cable television system to a pole, duct, conduit, or right-of-way owned or controlled by a utility," § 224(a)(4). The Telecommunications Act of 1996, § 703, 110 Stat. 150, expanded the definition to include, as an additional regulated category, "any attachment by a . . . provider of telecommunications service." § 224(a)(4) (1994 ed., Supp. V).

Cable companies had begun providing high-speed Internet service, as well as traditional cable television, over their wires even before 1996. The FCC had interpreted the Act to cover pole attachments for these commingled services, and its interpretation had been approved by the Court of Appeals for the District of Columbia Circuit. *Texas Util. Elec. Co.* v. *FCC*, 997 F. 2d 925, 927, 929 (1993). Finding nothing in the 1996 amendments to change its view on this question, the FCC continued to assert jurisdiction over pole attachments for these particular commingled services. *In re Implementation of Section 703(e) of the Telecommunications Act of 1996: Amendment of the Commission's Rules and Policies Governing Pole Attachments*, 13 FCC Rcd. 6777 (1998). In the same order the FCC concluded further that the amended Act covers attachments by wireless telecommunications providers. "[T]he use of the word 'any'

precludes a position that Congress intended to distinguish between wire and wireless attachments." *Id.*, at 6798.

Certain pole-owning utilities challenged the FCC's order in various Courts of Appeals. See 47 U. S. C. § 402(a) (1994 ed.); 28 U. S. C. § 2342 (1994 ed.). The challenges were consolidated in the Court of Appeals for the Eleventh Circuit, see § 2112(a), which reversed the FCC on both points. 208 F. 3d 1263 (2000). On the question of commingled services, the court held that the two specific rate formulas in 47 U. S. C. §§ 224(d)(3) and (e)(1) (1994 ed., Supp. V) narrow the general definition of pole attachments. The first formula applies to "any pole attachment used by a cable television system solely to provide cable service," § 224(d)(3), and the second applies to "pole attachments used by telecommunications carriers to provide telecommunications services," § 224(e)(1). The majority concluded that attachments for commingled services are neither, and that "no other rates are authorized." 208 F. 3d, at 1276, n. 29. Because it found that neither rate formula covers commingled services, it ruled those attachments must be excluded from the Act's coverage.

On the wireless question, the majority relied on the statutory definition of "utility": "any person . . . who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications." § 224(a)(1). The majority concluded that the definition of "utility" informed the definition of "pole attachment," restricting it to attachments used, at least in part, for wire communications. Attachments for wireless communications, it held, are excluded by negative implication. *Id.*, at 1274.

Judge Carnes dissented on these two issues. In his view, §§ 224(a)(4) and (b) "unambiguously giv[e] the FCC regulatory authority over wireless telecommunications service and Internet service." *Id.*, at 1281 (opinion concurring in part and dissenting in part). We granted certiorari. 531 U. S. 1125 (2001).

## II

We turn first to the question whether the Act applies to attachments that provide high-speed Internet access at the same time as cable television, the commingled services at issue here. As we have noted, the Act requires the FCC to "regulate the rates, terms, and conditions for pole attachments," § 224(b) (1994 ed.), and defines these to include "any attachment by a cable television system," § 224(a)(4) (1994 ed., Supp. V). These provisions resolve the question.

No one disputes that a cable attached by a cable television company, which provides only cable television service, is an attachment "by a cable television system." If one day its cable provides high-speed Internet access, in addition to cable television service, the cable does not cease, at that instant, to be an attachment "by a cable television system." The addition of a service does not change the character of the attaching entity—the entity the attachment is "by." And this is what matters under the statute.

This is our own, best reading of the statute, which we find unambiguous. If the statute were thought ambiguous, however, the FCC's reading must be accepted nonetheless, provided it is a reasonable interpretation. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–844 (1984). Respondents' burden, then, is not merely to refute the proposition that "any attachment" means "any attachment"; they must prove also the FCC's interpretation is unreasonable. This they cannot do.

Some respondents now advance an interpretation of the statute not presented to the Court of Appeals, or, so far as our review discloses, to the FCC. They contend it is wrong to concentrate on whose attachment is at issue; the question, they say, is what does the attachment do? Under this approach, an attachment is only an attachment by a cable television system to the extent it is used to provide cable television. To the extent it does other things, it falls outside the ambit of the Act, and respondents may charge whatever

rates they choose. To make this argument, respondents rely on a statutory definition of "cable system" (which the FCC treats as synonymous with "cable television system," see 47 CFR § 76.5(a) (2000)). The definition begins as follows: "[T]he term 'cable system' means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community." 47 U. S. C. § 522(7) (1994 ed., Supp. V). The first part of the definition would appear to cover commingled services, but the definition goes on to exclude "a facility of a common carrier . . . except that such facility shall be considered a cable system . . . to the extent such facility is used in the transmission of video programming directly to subscribers, unless the extent of such use is solely to provide interactive on-demand services." *Ibid.*

Respondents assert that "most major cable companies are now common carriers [since they also provide] residential and/or commercial telephone service." Brief for Respondents American Electric Power Service Corp. et al. 20. If so, they contend, then for purposes of § 224(a)(4), a facility that provides commingled cable television and Internet service is a "cable television system" only "to the extent that" it provides cable television.

Even if a cable company is a common carrier because it provides telephone service, of course, the attachment might still fall under the second half of the "pole attachments" definition: "any attachment by a . . . provider of telecommunications service." § 224(a)(4). This argument, and the related assertion that "most major cable companies are now common carriers," need not be considered by us in the first instance, when neither the FCC nor the Court of Appeals has had the opportunity to pass upon the points. There is a factual premise here, as well as an application of the statute to the facts, that the FCC and the Court of Appeals ought

to have the opportunity to address in the first instance. This does not leave the cases in doubt, however. Even if a "cable television system" is best thought of as a certain "facility" rather than a certain type of entity, respondents still must confront the problem that the statute regulates attachments "by" (rather than "of") these facilities. The word "by" still limits pole attachments by who is doing the attaching, not by what is attached. So even if a cable television system is only a cable television system "to the extent" it provides cable television, an "attachment . . . by a cable television system" is still (entirely) an attachment "by" a cable television system whether or not it does other things as well.

The Court of Appeals based its ruling on a different theory. The statute sets two different formulas for just and reasonable rates—one for pole attachments "used by a cable television system solely to provide cable service," § 224(d)(3), and one for those "used by telecommunications carriers to provide telecommunications services," § 224(e)(1). In a footnote, the Court of Appeals concluded without analysis that "subsections (d) and (e) narrow (b)(1)'s general mandate to set just and reasonable rates." 208 F. 3d, at 1276, n. 29. In its view, Congress would not have provided two specific rate formulas, and yet left a residual category for which the FCC would derive its own view of just and reasonable rates. "The straightforward language of subsections (d) and (e) directs the FCC to establish two specific just and reasonable rates . . . ; no other rates are authorized." *Ibid.*

This conclusion has no foundation in the plain language of §§ 224(a)(4) and (b). Congress did indeed prescribe two formulas for "just and reasonable" rates in two specific categories; but nothing about the text of §§ 224(d) and (e) (1994 ed. and Supp. V), and nothing about the structure of the Act, suggest that these are the exclusive rates allowed. It is true that specific statutory language should control more general language when there is a conflict between the two.

Here, however, there is no conflict. The specific controls but only within its self-described scope.

The sum of the transactions addressed by the rate formulas—§ 224(d)(3) (1994 ed., Supp. V) (attachments "used by a cable television system solely to provide cable service") and § 224(e)(1) (attachments "used by telecommunications carriers to provide telecommunications services")—is less than the theoretical coverage of the Act as a whole. Section 224(a)(4) reaches "any attachment by a cable television system or provider of telecommunications service." The first two subsections are simply subsets of—but not limitations upon—the third.

Likewise, nothing about the 1996 amendments suggests an intent to decrease the jurisdiction of the FCC. To the contrary, the amendments' new provisions extend the Act to cover telecommunications. As we have noted, commingled services were covered under the statute as first enacted, in the views of the FCC and the Court of Appeals for the District of Columbia Circuit. *Texas Util. Elec. Co.* v. *FCC,* 997 F. 2d 925 (1993). Before 1996, it is true, the grant of authority in §§ 224(a)(4) and (b) was coextensive with the application of the single rate formula in § 224(d). The 1996 amendments limited § 224(d) to attachments used by a cable television system "solely to provide cable service," but—despite *Texas Util. Elec. Co.*—did not so limit "pole attachment" in § 224(a)(4). At this point, coextensiveness ended. Cable television systems that also provide Internet service are still covered by §§ 224(a)(4) and (b)—just as they were before 1996—whether or not they are now excluded from the specific rate formula of § 224(d); if they are, this would simply mean that the FCC must prescribe just and reasonable rates for them without necessary reliance upon a specific statutory formula devised by Congress.

The Court of Appeals held that §§ 224(d) and (e) implicitly limit the reach of §§ 224(a)(4) and (b); as a result, it was compelled to reach the question of the correct categoriza-

tion of Internet services—that is, whether these services are "cable service," § 224(d)(3), or "telecommunications services," § 224(e)(1). It held that they are neither. By contrast, we hold that §§ 224(d) and (e) work no limitation on §§ 224(a)(4) and (b); for this reason, and because we granted certiorari only to determine the scope of the latter provisions, we need not decide the scope of the former.

The FCC had to go a step further, because once it decided that it had jurisdiction over attachments providing commingled services, it then had to set a just and reasonable rate. Again, no rate challenge is before us, but we note that the FCC proceeded in a sensible fashion. It first decided that Internet services are not telecommunications services:

> "Several commentators suggested that cable operators providing Internet service should be required to pay the Section 224(e) telecommunications rate. We disagree. . . . Under [our] precedent, a cable television system providing Internet service over a commingled facility is not a telecommunications carrier subject to the revised rate mandated by Section 224(e) by virtue of providing Internet service." 13 FCC Rcd., at 6794–6795 (footnotes omitted).

After deciding Internet services are not telecommunications services, the FCC then found that it did not need to decide whether they are cable services:

> "Regardless of whether such commingled services constitute 'solely cable services' under Section 224(d)(3), we believe that the subsection (d) rate should apply. If the provision of such services over a cable television system is a 'cable service' under Section 224(d)(3), then the rate encompassed by that section would clearly apply. Even if the provision of Internet service over a cable television system is deemed to be neither 'cable service' nor 'telecommunications service' under the existing definitions, the Commission is still obligated under Sec-

tion 224(b)(1) to ensure that the 'rates, terms and conditions [for pole attachments] are just and reasonable,' . . . [a]nd we would, in our discretion, apply the subsection (d) rate as a 'just and reasonable rate.'" *Id.,* at 6795–6796 (footnote omitted).

Respondents are frustrated by the FCC's refusal to categorize Internet services, and doubly frustrated by the FCC's contingent decision that even if commingled services are not "cable service," those services nevertheless warrant the §224(d) rate. On the first point, though, decisionmakers sometimes dodge hard questions when easier ones are dispositive; and we cannot fault the FCC for taking this approach. The second point, in essence, is a challenge to the rate the FCC has chosen, a question not now before us.

We note that the FCC, subsequent to the order under review, has reiterated that it has not yet categorized Internet service. See, *e. g.,* Pet. for Cert. in No. 00–843, p. 15, n. 4. It has also suggested a willingness to reconsider its conclusion that Internet services are not telecommunications. See, *e. g., In re Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities,* 15 FCC Rcd. 19287, 19294 (2000). Of course, the FCC has power to reconsider prior decisions. The order under review in this litigation, however, is both logical and unequivocal.

If the FCC should reverse its decision that Internet services are not telecommunications, only its choice of rate, and not its assertion of jurisdiction, would be implicated by the reversal. In this suit, though, we address only whether pole attachments that carry commingled services are subject to FCC regulation at all. The question is answered by §§224(a)(4) and (b), and the answer is yes.

Even if the FCC decides, in the end, that Internet service is not "cable service," the result obtained by its interpretation of §§224(a)(4) and (b) is sensible. Congress may well have chosen to define a "just and reasonable" rate for pure cable television service, yet declined to produce a prospec-

tive formula for commingled cable service. The latter might be expected to evolve in directions Congress knew it could not anticipate. As it was in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), the subject matter here is technical, complex, and dynamic; and as a general rule, agencies have authority to fill gaps where the statutes are silent, *id.*, at 843–844. It might have been thought prudent to provide set formulas for telecommunications service and "solely cable service," and to leave unmodified the FCC's customary discretion in calculating a "just and reasonable" rate for commingled services.

This result is more sensible than the one for which respondents contend. On their view, if a cable company attempts to innovate at all and provide anything other than pure television, it loses the protection of the Pole Attachments Act and subjects itself to monopoly pricing. The resulting contradiction of longstanding interpretation—on which cable companies have relied since before the 1996 amendments to the Act—would defeat Congress' general instruction to the FCC to "encourage the deployment" of broadband Internet capability and, if necessary, "to accelerate deployment of such capability by removing barriers to infrastructure investment." Pub. L. 104–104, Tit. VII, §§ 706(a), (b), and (c)(1), 110 Stat. 153, note following 47 U. S. C. § 157 (1994 ed., Supp. V). This congressional policy underscores the reasonableness of the FCC's interpretation: Cable attachments providing commingled services come within the ambit of the Act.

## III

The second question presented is whether and to what extent the equipment of wireless telecommunications providers is susceptible of FCC regulation under the Act. The Eleventh Circuit held that "the act does not provide the FCC with authority to regulate wireless carriers." 208 F. 3d, at 1275. All parties now agree this holding was overstated.

"[T]o the extent a wireless carrier seeks to attach a wireline facility to a utility pole . . . the wireline attachment is subject to Section 224." Brief for Respondents American Electric Power Service Corp. et al. 31; see also Brief for Respondents Atlantic City Electric Co. et al. 40; Brief for Repondent TXU Electric Co. 18; Brief for Respondent Florida Power & Light Co. 10–11. We agree, and we so hold.

The dispute that remains becomes a narrow one. Are some attachments by wireless telecommunications providers—those, presumably, which are composed of distinctively wireless equipment—excluded from the coverage of the Act? Again, the dispositive text requires the FCC to "regulate the rates, terms, and conditions for pole attachments," § 224(b) (1994 ed.), and defines these to include "any attachment by a . . . provider of telecommunications service," § 224(a)(4) (1994 ed., Supp. V). "Telecommunications service," in turn, is defined as the offering of telecommunications to the public for a fee, "regardless of the facilities used," § 153(46). A provider of wireless telecommunications service is a "provider of telecommunications service," so its attachment is a "pole attachment."

Once more, respondents seek refuge in other parts of the statute. A "utility" is defined as an entity "who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications." § 224(a)(1). The definition, though, concerns only whose poles are covered, not which attachments are covered. Likewise, the rate formula is based upon the poles' "usable space," which is defined as "the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment," § 224(d)(2) (1994 ed.). This definition, too, does not purport to limit which pole attachments are covered.

In short, nothing in § 224(a)(1) or § 224(d)(2) limits § 224(a)(4) or § 224(b). Even if they did, moreover, respondents still would need to confront the provision for "associ-

ated equipment." As noted above, respondents themselves concede that attachments of wires by wireless providers of telecommunications service are covered by the Act. See *supra*, at 339–340. It follows, in our view, that "associated equipment" which is indistinguishable from the "associated equipment" of wire-based telecommunications providers would also be covered. Respondents must demand a distinction between prototypical wire-based "associated equipment" and the wireless "associated equipment" to which they object. The distinction, they contend, is required by the economic rationale of the Act. The very reason for the Act is that—as to wires—utility poles constitute a bottleneck facility, for which utilities could otherwise charge monopoly rents. Poles, they say, are not a bottleneck facility for the siting of at least some, distinctively wireless equipment, like antennas. These can be located anywhere sufficiently high.

The economic analysis may be correct as far as it goes. Yet the proposed distinction—between prototypical wire-based "associated equipment" and the wireless "associated equipment" which allegedly falls outside of the rationale of the Act—finds no support in the text, and, based on our present understanding of the record before us, appears quite difficult to draw. Congress may have decided that the difficulties of drawing such a distinction would burden the orderly administration of the Act. In any event, the FCC was not unreasonable in declining to draw this distinction; and if the text were ambiguous, we would defer to its judgment on this technical question.

## IV

Respondents insist that "any attachment" cannot mean "any attachment." Surely, they say, the Act cannot cover billboards, or clotheslines, or anything else that a cable television system or provider of telecommunications service should fancy attaching to a pole. Since the literal reading is absurd, they contend, there must be a limiting principle.

The FCC did not purport either to enunciate or to disclaim a specific limiting principle, presumably because, in its view, the attachments at issue here did not test the margins of the Act. The term "any attachment by a cable television system" covers at least those attachments which do in fact provide cable television service, and "any attachment by a . . . provider of telecommunications service" covers at least those which in fact provide telecommunications. Attachments of other sorts may be examined by the agency in the first instance.

The attachments at issue in this suit—ones which provide commingled cable and Internet service and ones which provide wireless telecommunications—fall within the heartland of the Act. The agency's decision, therefore, to assert jurisdiction over these attachments is reasonable and entitled to our deference. The judgment of the Court of Appeals for the Eleventh Circuit is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR took no part in the consideration or decision of these cases.

## APPENDIX TO OPINION OF THE COURT

47 U. S. C. § 224. Pole attachments

(a) Definitions
As used in this section:

(1) The term "utility" means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility, and who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications. Such term does not include any railroad, any person who is cooperatively organized, or any person owned by the Federal Government or any State.

(2) The term "Federal Government" means the Government of the United States or any agency or instrumentality thereof.

(3) The term "State" means any State, territory, or possession of the United States, the District of Columbia, or any political subdivision, agency, or instrumentality thereof.

(4) The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

(5) For purposes of this section, the term "telecommunications carrier" (as defined in section 153 of this title) does not include any incumbent local exchange carrier as defined in section 251(h) of this title.

(b) Authority of Commission to regulate rates, terms, and conditions; enforcement powers; promulgation of regulations

(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of this title.

(2) The Commission shall prescribe by rule regulations to carry out the provisions of this section.

(c) State regulatory authority over rates, terms, and conditions; preemption; certification; circumstances constituting State regulation

(1) Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions, or access to poles, ducts, conduits, and

rights-of-way as provided in subsection (f) of this section, for pole attachments in any case where such matters are regulated by a State.

(2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the Commission that—

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of the services offered via such attachments, as well as the interests of the consumers of the utility services.

(3) For purposes of this subsection, a State shall not be considered to regulate the rates, terms, and conditions for pole attachments—

(A) unless the State has issued and made effective rules and regulations implementing the State's regulatory authority over pole attachments; and

(B) with respect to any individual matter, unless the State takes final action on a complaint regarding such matter—

(i) within 180 days after the complaint is filed with the State, or

(ii) within the applicable period prescribed for such final action in such rules and regulations of the State, if the prescribed period does not extend beyond 360 days after the filing of such complaint.

(d) Determination of just and reasonable rates; "usable space" defined

(1) For purposes of subsection (b) of this section, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and

actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(2) As used in this subsection, the term "usable space" means the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment.

(3) This subsection shall apply to the rate for any pole attachment used by a cable television system solely to provide cable service. Until the effective date of the regulations required under subsection (e) of this section, this subsection shall also apply to the rate for any pole attachment used by a cable system or any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) to provide any telecommunications service.

(e) Regulations governing charges; apportionment of costs of providing space

(1) The Commission shall, no later than 2 years after February 8, 1996, prescribe regulations in accordance with this subsection to govern the charges for pole attachments used by telecommunications carriers to provide telecommunications services, when the parties fail to resolve a dispute over such charges. Such regulations shall ensure that a utility charges just, reasonable, and nondiscriminatory rates for pole attachments.

(2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

(3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

(4) The regulations required under paragraph (1) shall become effective 5 years after February 8, 1996. Any increase

in the rates for pole attachments that result from the adoption of the regulations required by this subsection shall be phased in equal annual increments over a period of 5 years beginning on the effective date of such regulations.

(f) Nondiscriminatory access

(1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.

(2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

(g) Imputation to costs of pole attachment rate

A utility that engages in the provision of telecommunications services or cable services shall impute to its costs of providing such services (and charge any affiliate, subsidiary, or associate company engaged in the provision of such services) an equal amount to the pole attachment rate for which such company would be liable under this section.

(h) Modification or alteration of pole, duct, conduit, or right-of-way

Whenever the owner of a pole, duct, conduit, or right-of-way intends to modify or alter such pole, duct, conduit, or right-of-way, the owner shall provide written notification of such action to any entity that has obtained an attachment to such conduit or right-of-way so that such entity may have a reasonable opportunity to add to or modify its existing attachment. Any entity that adds to or modifies its existing attachment after receiving such notification shall bear a proportionate share of the costs incurred by the owner in making such pole, duct, conduit, or right-of-way accessible.

(i) Costs of rearranging or replacing attachment

An entity that obtains an attachment to a pole, conduit, or right-of-way shall not be required to bear any of the costs

of rearranging or replacing its attachment, if such rearrangement or replacement is required as a result of an additional attachment or the modification of an existing attachment sought by any other entity (including the owner of such pole, duct, conduit, or right-of-way).

JUSTICE THOMAS, with whom JUSTICE SOUTER joins, concurring in part and dissenting in part.

I join Parts I and III of the Court's opinion because I agree that the Pole Attachments Act, 47 U. S. C. § 224 (1994 ed. and Supp. V), grants the Federal Communications Commission (FCC or Commission) jurisdiction to regulate attachments by wireless telecommunications providers. The Court's conclusion in Part II of its opinion that the Act gives the FCC the authority to regulate rates for attachments providing commingled cable television service and high-speed Internet access may be correct as well.

Nevertheless, because the FCC failed to engage in reasoned decisionmaking before asserting jurisdiction over attachments transmitting these commingled services, I cannot agree with the Court that the judgment below should be reversed and the FCC's decision on this point allowed to stand. Instead, I would vacate the Court of Appeals' judgment and remand the cases to the FCC with instructions that the Commission clearly explain the specific statutory basis on which it is regulating rates for attachments that provide commingled cable television service and high-speed Internet access. Such a determination would require the Commission to decide at long last whether high-speed Internet access provided through cable wires constitutes cable service or telecommunications service or falls into neither category.

I

As these cases have been presented to this Court, the dispute over the FCC's authority to regulate rates for attachments providing commingled cable television service and high-speed Internet access turns on one central question:

whether 47 U. S. C. § 224(b)(1)'s general grant of authority empowers the FCC to regulate rates for "pole attachments," § 224(a)(4) (1994 ed., Supp. V), that are not covered by either of the Act's two specific rate methodologies, § 224(d) and § 224(e) (1994 ed. and Supp. V). Petitioners, including the FCC, contend that § 224(b)(1) (1994 ed.) authorizes the Commission to regulate rates for all "pole attachments" as that term is defined in § 224(a)(4) (1994 ed., Supp. V). Respondents, on the other hand, argue that the FCC may only regulate rates for attachments covered by one of the two specific rate methodologies set forth in the Act, the position adopted by the Court of Appeals below.

It is not at all clear, however, that the disputed attachments at issue here—those providing both cable television programming and high-speed Internet access—are attachments for which neither of the Act's two specific rate methodologies applies. The FCC has made no determination with respect to this issue that this Court (or any other court) can review. Indeed, there is nothing in the record indicating whether *any* pole attachments currently exist that fall within the terms of § 224(a)(4) yet are not covered by either of the Act's specific rate methodologies. Consequently, the specific legal issue the Court chooses to address is, at this time, nothing more than a tempest in a teapot.

The disputed attachments here provide two distinct services: conventional cable television programming and high-speed Internet access. No party disputes the FCC's conclusion that conventional cable television programming constitutes cable service. See *ante*, at 333. Crucially, however, the FCC has made no determination as to the proper statutory classification of high-speed Internet access using cable modem technology. In fact, in asserting its authority to regulate rates for attachments providing commingled cable television service and high-speed Internet access, the Commission explicitly declined to address the issue: "We need not decide at this time . . . the precise category into which Internet services fit." *In re Implementation of Sec-*

*tion 703(e) of the Telecommunications Act of 1996: Amendment of the Commission's Rules and Policies Governing Pole Attachments,* 13 FCC Rcd. 6777, 6795 (1998). In their petition for certiorari, the Government and the FCC explained that the FCC proceeded in this manner "because the classification of cable Internet access as 'cable service,' 'telecommunications service,' or some other form of service is the subject of ongoing proceedings before the Commission concerning issues outside the Pole Attachments Act," and it "'d[id] not intend . . . to foreclose any aspect of the Commission's ongoing examination of those issues.'" Pet. for Cert. in No. 00–843, p. 5, n. 2 (quoting 13 FCC Rcd., at 6795).

The statutory scheme, however, does not permit the FCC to avoid this question. None of the parties disputes that the two specific rate methodologies set forth in the Act are mandatory if applicable. If an attachment by a cable television system is used solely to provide cable service, the rate for that attachment *must* be set pursuant to the methodology contained in § 224(d). See 47 U. S. C. § 224(d)(3). And, if an attachment is used to provide telecommunications service, the rate for that attachment *must* be set pursuant to the methodology contained in § 224(e). As a result, before the FCC may regulate rates for a category of attachments, the statute requires the FCC to make at least two determinations: whether the attachments are used "solely to provide cable service" and whether the attachments are used to provide "telecommunications service."

Here, however, the FCC has failed to take either necessary step. For if high-speed Internet access using cable modem technology is a cable service,[1] then attachments providing commingled cable television programming and high-speed Internet access are used solely to provide cable service, and the rates for these attachments *must* be regulated pursuant to § 224(d)'s methodology. Or if, on the other hand, such In-

[1] See, *e. g., MediaOne Group, Inc.* v. *County of Henrico,* 97 F. Supp. 2d 712, 715 (ED Va. 2000), aff'd on other grounds, 257 F. 3d 356 (CA4 2001) (concluding that cable modem service is a cable service).

ternet access constitutes a telecommunications service,[2] then these attachments are used to provide telecommunications service and *must* be regulated pursuant to §224(e)'s rate methodology.[3]

Only after determining whether either of the Act's mandatory rate methodologies applies to particular attachments and answering that question in the negative does the statute allow the FCC to examine whether it may define a "just and reasonable" rate for those attachments pursuant to §224(b)(1). Had the FCC engaged in such reasoned decisionmaking below and concluded that it had the authority to regulate rates for attachments used to provide commingled cable television service and high-speed Internet access *even though* high-speed Internet access using cable modem technology constitutes neither cable service nor telecommunications service, then this Court would have been able to review the Commission's order in a logical manner. We first would have asked whether the Commission had permissibly classified the services provided by these attachments. And, if we answered that question in the affirmative, we would then (and only then) have asked whether the FCC has the authority under §224(b)(1) to regulate rates for attachments where Congress has not provided an applicable rate methodology.

Instead, the FCC asks this Court to sustain its authority to regulate rates for attachments providing commingled cable television programming and high-speed Internet access, even though it has yet to articulate the specific statutory basis for its authority to regulate these attachments. Yet, as Justice Harlan noted some years ago: "Judicial review of [an agency's] orders will . . . function accurately and effica-

---

[2] See, *e. g., AT&T Corp.* v. *Portland,* 216 F. 3d 871, 878 (CA9 2000) (concluding that cable modem service is a telecommunications service).

[3] Rates set pursuant to §224(e)'s methodology are generally higher than those set pursuant to §224(d)'s methodology. See Brief for Petitioners in No. 00–843, p. 24; Brief for Respondents Atlantic City Elec. Co. et al. 10, n. 2.

ciously only if the [agency] indicates fully and carefully the methods by which . . . it has chosen to act." *Permian Basin Area Rate Cases*, 390 U. S. 747, 792 (1968). Here, the FCC obviously has fallen far short of this standard.

The FCC seems to hold open the following options: (a) Rates for attachments providing commingled cable television programming and high-speed Internet access may be regulated pursuant to § 224(d)'s rate methodology; (b) rates for these attachments may be regulated pursuant to § 224(e)'s rate methodology; or (c) rates for these attachments may be regulated under the FCC's general authority to define "just and reasonable" rates pursuant to § 224(b)(1). To be sure, the Commission has rejected a fourth possible option advanced by respondents: that it lacks any authority to regulate rates for attachments providing commingled cable television programming and high-speed Internet access. But if the FCC wishes to regulate rates for these attachments, the statute requires the Commission to do more. Eliminating only one of four possible answers in this instance does not constitute reasoned decisionmaking.

For these reasons, the FCC's attempt to regulate rates for attachments providing commingled cable television service and high-speed Internet access while refusing to classify the services provided by these attachments is "arbitrary, capricious," and "not in accordance with law." 5 U. S. C. § 706(2)(A). I would therefore remand these cases to the FCC for the Commission to identify the specific statutory basis for its authority to regulate rates for attachments providing commingled cable television programming and high-speed Internet access: 47 U. S. C. § 224(d), § 224(e), or § 224(b)(1) (1994 ed. and Supp. V).

## II

Notwithstanding the FCC's failure to classify the services provided by the attachments at issue in these cases, the Court nonetheless concludes that the FCC's analysis below

was adequate. Proceeding from the premise that the Commission in fact *has determined* that high-speed Internet access using cable modem technology is not a telecommunications service, see *ante,* at 337, the Court finds that the Commission, after reaching this conclusion, was not required to determine whether the attachments here are used solely to provide cable service. Even if the FCC had concluded that these attachments are not used solely to provide cable service, the Court notes that the FCC indicated it would have used its power under § 224(b)(1) to apply § 224(d)'s rate methodology regardless. See *ante,* at 337–338. Under the Court's reasoning, this is therefore a case of six of one, a half dozen of another. Either the FCC must apply § 224(d)'s methodology to attachments providing commingled cable television programming and high-speed Internet access because such attachments are used solely to provide cable service, see § 224(d)(3) (1994 ed., Supp. V), or the FCC has exercised its power under § 224(b)(1) (1994 ed.) to regulate the rates for these attachments and has chosen to "apply the [§ 224(d)] rate as a 'just and reasonable' rate." 13 FCC Rcd., at 6796. The problem with this position is twofold.

## A

First, the FCC has not conclusively determined that high-speed Internet access using cable modem technology is *not* a telecommunications service. Admittedly, the FCC's discussion of the topic in its order below was opaque.[4] The

---

[4] Residential high-speed Internet access typically requires two separate steps. The first is transmission from a customer's home to an Internet service provider's (ISP's) point of presence. This service is generally provided by a cable or phone company over wires attached to poles, ducts, conduits, and rights-of-way. The second is a service delivered by an ISP to provide the connection between its point of presence and the Internet. See Brief for United States Telecom Assn. et al. as *Amici Curiae* 6. The Commission has classified the second step of this process, the service provided by an ISP, as an "information service." See, *e. g., In re Deployment of Wireline Services Offering Advanced Telecommunications Capability,*

Commission, however, has since made its lack of a position on the issue unambiguous.

The FCC has not represented to this Court that high-speed Internet access provided through cable wires is *not* a telecommunications service. To the contrary, it has made its agnosticism on the topic quite clear. In its petition for

15 FCC Rcd. 385, 401 (1999). To date, however, the FCC has not classified the first step of this process in the cable context. Notably, when high-speed Internet access is provided over phone lines, in what is generally known as DSL service, the FCC has classified the first step of this process as involving the provision of a telecommunications service. See *id.*, at 402–403.

The FCC's order below reflected the Commission's position. In its order, the Commission never specifically addressed whether transmission over cable wires from a customer's residence to an ISP's point of presence constitutes a telecommunications service. Instead, the FCC merely referred to its earlier decision that ISPs do not provide a telecommunications service under the 1996 Telecommunications Act. It then reasoned that "[u]nder this precedent, a cable television system providing Internet service over a commingled facility is not a telecommunications carrier subject to the revised rate mandated by Section 224(e) by virtue of providing Internet service." *In re Implementation of Section 703(e) of the Telecommunications Act of 1996: Amendment of the Commission's Rules and Policies Governing Pole Attachments*, 13 FCC Rcd. 6777, 6794–6795 (1998). To be sure, to the extent that a cable television system actually provides Internet service like any other ISP it is undoubtedly providing an "information service" under the Commission's precedents. The Commission's analysis, however, failed to address the crucial question: What type of service is provided when cable wires are used to transmit information between a customer's home and an ISP's point of presence?

It is for this reason perhaps that the Commission explained in its order below that it was reviewing the extent to which its "definition[s] of 'telecommunications' and 'telecommunications service' . . . [were] consistent with the . . . Act" and did "not intend, in this proceeding, to foreclose any aspect of the Commission's ongoing examination of those issues." *Id.*, at 6795. Crucially, when the FCC released that "review," it expressly stated "no view . . . on the applicability of [its prior] analysis to cable operators providing Internet access service," and noted that "we have not yet established the regulatory classification of Internet services provided over cable television facilities." *In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501, 11535, n. 140 (1998).

certiorari, for instance, the FCC complained that the Court of Appeals "mistakenly felt compelled to address whether a cable company's provision of Internet access is properly characterized as a 'cable service,' a 'telecommunications service,' or an 'information service.'" Pet. for Cert. in No. 00–843, p. 15, n. 4. It then clearly stated, "To date, the FCC *has taken no position* on that issue." *Ibid.* (emphasis added). The FCC not only repeated this contention in its merits brief, see Brief for Petitioners in No. 00–843, p. 30, but also explicitly asked this Court *not* to evaluate whether high-speed Internet access using cable modem technology is "a 'cable service,' a 'telecommunications service,' or some other kind of service," *ibid., even if* we concluded such an inquiry was necessary to determine whether the FCC could regulate rates for attachments providing commingled cable television programming and high-speed Internet access. The reason it gave for this request was simple: The FCC should be allowed to "address the characterization issue in *the first instance.*" *Id.,* at 31 (emphasis added).

Outside of this litigation, the FCC has also unambiguously indicated that it holds "no position" as to whether high-speed Internet access using cable modem technology constitutes a telecommunications service. For example, in an *amicus curiae* brief submitted to the United States Court of Appeals for the Ninth Circuit, the FCC stated: "To date, the Commission has not decided whether broadband capability offered over cable facilities is a 'cable service' under the Communications Act, or instead should be classified as 'telecommunications' or as an 'information service.' The answer to this question is far from clear." Brief for FCC as *Amicus Curiae* in *AT&T Corp.* v. *Portland,* No. 99–35609 (CA9), p. 19.[5] Just last year, in fact, the Commission issued a notice

---

[5] The FCC's *amicus curiae* brief in *AT&T Corp.* v. *Portland* is completely inconsistent with the Court's position that the FCC has not decided whether high-speed Internet access using cable modem technology constitutes cable service but has concluded that such Internet access is not a

of inquiry seeking comment on the proper statutory classification of high-speed Internet access using cable modem technology. See *In re Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities,* 15 FCC Rcd. 19287 (2000). In this notice of inquiry, the FCC specifically sought comment on, among other issues, whether such Internet access "is a telecommunications service," see *id.,* at 19294, at no point indicating that the FCC had ever taken any position on the issue.

The Court's conclusion that the FCC has already decided that high-speed Internet access using cable modem technology is not a telecommunications service thus stands in stark contrast to the FCC's own view of the matter. "[T]he Commission has not determined whether Internet access via cable system facilities should be classified as a 'cable service' subject to Title VI of the Act, or as a 'telecommunications' or 'information service' subject to Title II. There may well come a time when it will be necessary and useful from a policy perspective for the Commission to make these legal determinations." *In re Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from MediaOne Group, Inc., to AT&T Corp.,* 15 FCC Rcd. 9816, 9872 (2000) (footnote omitted).

The Court, however, does not dispute that reasoned decisionmaking required the FCC to make the "legal determination" whether high-speed Internet access using cable modem technology constitutes a telecommunications service nearly four years ago when the Commission asserted its authority

telecommunications service. The FCC's brief questions whether the provision of Internet access through a cable modem is a "cable service" without taking a definitive position on the question. Brief for FCC as *Amicus Curiae* in No. 99–35609 (CA9), pp. 19–26. The FCC then observes, "[O]n a conceptual level, an argument can be made that Internet access is more appropriately characterized as an information or telecommunications service rather than a cable service." *Id.,* at 26. The Commission then notes, however, that it "has not yet conclusively resolved the issue." *Ibid.*

to regulate rates for attachments providing commingled cable television programming and high-speed Internet access. Instead, the Court mistakenly concludes that the Commission has reached a decision on the issue. In the Court's view, the FCC's repeated statements that it has not determined whether high-speed Internet access using cable modem technology constitutes a telecommunications service only reflect the "[Commission's] willingness to reconsider its conclusion that Internet services are not telecommunications." *Ante*, at 338. The relevant issue here, however, is not whether *Internet service* is a telecommunications service. Rather, it is whether *high-speed Internet access* provided through cable wires constitutes a telecommunications service. The two questions are entirely distinct, see n. 4, *supra*, and, as shown above, the FCC has never answered the latter question and has indicated as much no less than six times in recent years.[6] These cases therefore should be remanded to the FCC on this basis alone.

## B

Second, even if the FCC had determined that high-speed Internet access provided through cable wires does not constitute a telecommunications service, these cases still would need to be remanded to the FCC. In order to endorse the FCC's primary argument that § 224(b)(1) provides the Commission with the authority to regulate rates for attachments not covered by either of the Act's specific rate methodologies, §§ 224(d) and 224(e), it seems necessary, as a matter of logic, for such attachments to exist. But as both the FCC and the

---

[6] See Pet. for Cert. in No. 00–843, p. 15, n. 4; Brief for Petitioners in No. 00–843, at 30; Brief for FCC as *Amicus Curiae* in No. 99–35609 (CA9), at 19–26; *In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd., at 11535, n. 140; *In re Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities*, 15 FCC Rcd. 19287, 19294 (2000); *In re Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from MediaOne Group, Inc., to AT&T Corp.*, 15 FCC Rcd. 9816, 9872 (2000).

Court admit, the attachments here very well may be addressed by one of the Act's rate formulas. Moreover, neither the FCC nor the Court advances a single example of any attachment that is a covered "pole attachment" under the definition provided in § 224(a)(4) (1994 ed., Supp. V) but is not covered by either of the Act's specific rate methodologies.

This obviously suggests a dilemma: If all attachments covered by the Act are in fact addressed by the Act's specific rate methodologies, then the coverage of § 224(a)(4) is not greater than the sum of §§ 224(d) and (e), and the FCC has no residual power to define "just and reasonable" rates for attachments pursuant to § 224(b)(1) (1994 ed.). Yet the Court affirms that the FCC indeed possesses just such authority.

Unable to provide a single example of an attachment not addressed by either of the Act's specific rate methodologies, the most the Court can argue is that "[t]he sum of the transactions addressed by the rate formulas . . . is less than the *theoretical* coverage of the Act as a whole." *Ante,* at 336 (emphasis added). The Court, though, offers no reasoning whatsoever in support of this observation, nor does it have any basis in the record.

Leaving aside that which may or may not be theoretically possible, I do not have a view at the present time as to whether any attachments exist that are covered "pole attachments" under the Act, see § 224(a)(4) (1994 ed., Supp. V), but do not fall within the ambit of § 224(d) or § 224(e) (1994 ed. and Supp. V).[7] I do question, however, whether Con-

---

[7] Two types of attachments are covered by § 224(a)(4) (1994 ed., Supp. V): those "by a cable television system" and those by a "provider of telecommunications service." Rates for attachments used to provide telecommunications service are covered by § 224(e)'s rate methodology regardless of whether these attachments are also used to provide cable service and/or other types of service as well. This is because § 224(e), unlike § 224(d)(3), does not contain the restriction that attachments must be used "solely" to provide a particular type of service for its methodology to apply. And rates for attachments used solely to provide cable service are regulated pursuant to § 224(d)'s methodology. See § 224(d)(3). As a result, the only

gress contemplated the existence of such attachments. Before 1996, the parties agree that the FCC did not possess any general authority to define "just and reasonable" rates for attachments pursuant to § 224(b)(1); rates for all attachments were set pursuant to the formula contained in § 224(d).[8] And if Congress in 1996 intended to transform § 224(b)(1) into a provision empowering the FCC to define "just and reasonable" rates for attachments, it did so in an odd manner: The 1996 amendments to the Act did not change a single word in the relevant statutory provision, and the legislative history contains nary a word indicating that Congress intended to take this step.[9]

Congress may have believed that attachments were *always* used to provide cable service and/or telecommunications service and then taken great care to ensure that specified rate methodologies covered all attachments providing each of these services and both of these services.[10] In

"pole attachments," as that term is defined in the Act, that would appear to fall outside of the Act's two specified rate methodologies would be any attachments used to provide only cable service and an additional type of service other than telecommunications service.

[8] For this reason, the Court's reference to "the FCC's *customary discretion* in calculating a 'just and reasonable' rate for commingled services" is rather misleading. *Ante*, at 339 (emphasis added). Prior to 1996, the FCC clearly did not enjoy "discretion" in calculating "just and reasonable" rates for any regulated attachments.

[9] See H. R. Rep. No. 104–204, pp. 220–221 (1996).

[10] While no reference is made in either the text of the Act or the legislative history to attachments providing any services beyond cable service and telecommunications service, the broader Telecommunications Act of 1996 does define such a third category of services: "information services." The statute defines "information service" as "the offering of a capability for generating, acquiring . . . , or making available information *via telecommunications*." 110 Stat. 59, 47 U. S. C. § 153(20) (1994 ed., Supp. V) (emphasis added). Given this definition, *amicus curiae* Earthlink, Inc., argues that "it is logically, technically, and legally impossible for an information service that is offered to the public for a fee to exist without an underlying telecommunications service. Quite simply, the only way that an information service can reach the public is over a telecommunications

this vein, Congress in 1996 provided a new rate methodology for the new category of attachments added to the Act,[11] see § 224(e), and required that the old rate methodology be applied to the new category of attachments until regulations implementing the new rate methodology for these attachments could be promulgated, see § 224(d)(3).

It is certainly possible that Congress, in fact, has not provided an applicable rate methodology for all attachments covered by § 224(a)(4). Knowing the size and composition of the universe of attachments not addressed by the Act's two specific rate methodologies, however, would be extremely useful in evaluating the reasonableness of the FCC's position that it may regulate rates for those attachments. So in the complete absence of evidence concerning whether any pole attachments actually exist that are not covered by either of the Act's two specific rate methodologies, my position is simple: It is not conducive to "accurate" or "efficacious" judicial review to consider in the abstract whether the FCC has been given the authority to regulate rates for these "theoretical" attachments. See *Permian Basin Area Rate Cases*, 390 U. S., at 792. This is especially true given that the unusual posture of these cases is entirely the result of the FCC's failure to engage in reasoned decisionmaking below. See Part I, *supra.*

## III

For many of the same reasons given by the Court, I believe it is likely that the FCC, at the end of the day,

service." Brief for Earthlink, Inc., as *Amicus Curiae* 24. If Earthlink's position is correct, then this suggests that attachments used to provide an information service may always also provide a telecommunications service and would thus be regulated pursuant to § 224(e)'s methodology.

[11] Prior to 1996, the Act only granted the FCC jurisdiction to regulate one category of attachments, those by a cable television system. See 47 U. S. C. § 224(a)(4) (1994 ed.). In 1996, however, Congress expanded the scope of the Act to cover attachments by providers of telecommunication service as well. See Telecommunications Act of 1996, 47 U. S. C. § 224 (1994 ed., Supp. V).

has the authority to regulate rates for attachments providing commingled cable television programming and high-speed Internet access. Prior to 1996, the Act was interpreted to grant the FCC such broad authority, see *Texas Util. Elec. Co.* v. *FCC*, 997 F. 2d 925, 929 (CADC 1993), and there is no clear indication in either the text of the 1996 amendments to the Act or the relevant legislative history that Congress intended to take this power away from the FCC.

Moreover, such an interpretation of the 1996 amendments to the Act would be in substantial tension with two congressional policies underlying the Telecommunications Act of 1996. First, Congress directed the FCC to "encourage the deployment" of high-speed Internet capability and, if necessary, to "take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment." See §§ 706(a), (b), and (c)(1), 110 Stat. 153, note following 47 U. S. C. § 157 (1994 ed., Supp. V). And second, Congress declared that "[i]t is the policy of the United States . . . to promote the continued development of the Internet and other interactive computer services and other interactive media." § 509, 47 U. S. C. § 230(b)(1). Needless to say, withdrawing the Act's rate protection for the attachments of those cable operators providing high-speed Internet access through their wires and instead subjecting their attachments to monopoly pricing would appear to be fundamentally inconsistent with encouraging the deployment of cable modem service and promoting the development of the Internet.

That the FCC may have reached a permissible conclusion below, however, does not excuse its failure to engage in reasoned decisionmaking and does not justify the Court's decision to allow the Commission's order to stand.[12] If the FCC

---

[12] Indeed, to the extent that the FCC holds open the possibility that high-speed Internet access using cable modem technology is a telecommunications service, its decision to regulate rates for the disputed attachments pursuant to § 224(d)'s rate methodology may result in utilities re-

is to regulate rates for attachments providing commingled cable television programming and high-speed Internet access, it is required to determine whether high-speed Internet access provided through cable wires is a cable service or telecommunications service or falls into neither category. See Part I, *supra.* The Commission does not claim to have taken this step. As a result, the judgment of the Court of Appeals should be vacated, and the cases should be remanded to the FCC with instructions that the Commission identify the specific statutory basis on which it believes it is authorized to regulate rates for attachments used to provide commingled cable television programming and high-speed Internet access: § 224(d), § 224(e), or § 224(b)(1).

For all of these reasons, I respectfully dissent from Parts II and IV of the Court's opinion.

---

ceiving a rate that is not "just and reasonable." This is because rates calculated pursuant to § 224(e)'s methodology are generally higher than those calculated pursuant to § 224(d)'s methodology. See n. 3, *supra.*