[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 13, 2002
THOMAS K. KAHN
CLERK

_____

No. 99-15160
_____

FCC Docket No. 96-00098

SOUTHERN COMPANY,

Petitioner,


UNITED TELECOM COUNSEL,
EDISON ELECTRIC INSTITUTE, INC., and
BELL ATLANTIC,

Intervenors,


versus


FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents,


MCI WORLDCOM, INC., AT&T, US WEST,
NATIONAL CABLE TELEVISION ASSOCIATION
and CALIFORNIA CABLE ASSOCIATION,

Intervenors.

_____

No. 00-10257

_____

FCC Docket No. 99-00266

FLORIDA POWER & LIGHT COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

MCI WORLDCOM, INC.,

Intervenor.

_____

No. 00-11027

_____

FCC Docket No. 96-00098

BALTIMORE GAS AND ELECTRIC COMPANY,

Petitioners,

versus

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

MCI WORLDCOM, INC.,

Intervenor.

2

———————————————

No. 00-11071

———————————————

FCC Docket No. 96-00098

COMMONWEALTH EDISON COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

MCI WORLDCOM, INC.,

Intervenor.

———————————————

No. 00-11193

———————————————

FCC Docket No. 96-00098

ATLANTIC CITY ELECTRIC COMPANY,
DELMARVA POWER AND LIGHT COMPANY,
DUQUENSE LIGHT COMPANY,
POTOMAC ELECTRIC POWER COMPANY,
PUBLIC SERVICE ELECTRIC AND GAS COMPANY,
RELIANT ENERGY HL&P,
TAMPA ELECTRIC COMPANY,
VIRGINIA ELECTRIC AND POWER COMPANY,

Petitioners,

versus

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

Respondents,

3

MCI WORLDCOM, INC.,

Intervenors.

_____

No. 00-11300
_____

FCC Docket No. 96-00098

AMERICAN ELECTRIC POWER SERVICE CORPORATION,

Petitioner,

BELL ATLANTIC,

Intervenor,

versus

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

MCI WORLDCOM, INC,

Intervenor.

_____

No. 00-11452
_____

FCC Docket No. 96-00098

DUKE ENERGY CORPORATION,

Petitioner,

BELL ATLANTIC,

Intervenor,

versus

4

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

                                                        Respondents,

MCI WORLDCOM, INC.,

                                                        Intervenor.

_____

Petitions for Review of Orders of the
Federal Communications Commission
_____
**(June 13, 2002)**


Before EDMONDSON, Chief Judge, BIRCH and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Petitioners, a geographically diverse group of electric utility companies, raise a series of challenges to several Federal Communications Commission (FCC) guidelines implementing the 1996 Amendments to the Pole Attachments Act, 47 U.S.C. § 224. After carefully reviewing petitioners' claims, and after the benefit of oral argument, we hold that the FCC erred when it issued guidelines stating (1) that the Pole Attachments Act's coverage extends to electric transmission facilities; and (2) that utilities must expand the capacity of their facilities to ensure that attaching entities have access to those facilities. On each of petitioners' remaining challenges to the FCC guidelines, we decline to disturb the FCC's determinations.

5

BACKGROUND

From the inception of the cable television industry, cable television companies have attached their distribution cables to utility poles owned and maintained by power and telephone companies. As a practical matter, cable companies have had little choice but to do so. The start up costs of constructing an entirely new set of poles and other distribution facilities for cable television cables are prohibitive, and when coupled with the difficulties of obtaining regulatory approval for a distinct set of utility poles, the barriers to such construction are insurmountable. Therefore, cable companies have long rented space from utilities on their extant poles and conduits. Ownership of the only facilities available gave the utilities a superior bargaining position when renting space to cable providers, and the Pole Attachments Act (passed in 1978) reflects Congress's decision to regulate this relationship.

The Pole Attachments Act gave the FCC the authority to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable" in any state that does not already have such regulations in place. *Id.* § 224(b)(1). This Act established a set of guidelines for the FCC to use in determining whether the rates and terms of pole attachments

6

were "just and reasonable," and based upon these guidelines, the FCC promulgated a series of rules regulating the practice.

Importantly, the FCC's regulatory authority pursuant to the Pole Attachments Act was limited; it could not mandate that utilities make their poles available to cable providers, but rather could merely regulate the rates charged those cable providers that were voluntarily given access to poles. Voluntary access was hardly an issue at the time. Indeed, utilities were anxious to lease surplus portions of their poles to cable providers, and thus get some return on what would otherwise be surplus plant. The problem that the Pole Attachments Act sought to address was the potentially unfair prices utilities could extract from cable companies for leasing space, not any problems associated with the denial of access to the cable companies.

By 1996, the economic landscape surrounding pole attachments had undergone a fundamental change. Electric utilities saw the telecommunications arena as a logical and potentially lucrative choice for the diversification of their businesses. Cable companies were fearful that the utilities' prospective entry into the telecommunications market would endanger their pole attachments, as utilities would be unwilling to rent space on their poles to competing entities. Congress elected to address both of these matters in the 1996 Telecommunications Act.

The 1996 Telecommunications Act authorized expanded competition in telecommunications markets, permitting utilities to enter that rapidly expanding field. Congress recognized, however, that utilities would lose the incentive to voluntarily enter into pole attachment agreements with telecommunications and cable television companies that were now their competitors.[1] Congress thus added a "nondiscriminatory access" provision to the Pole Attachments Act, requiring any utility that uses its poles, ducts, conduits, or rights-of-way for wire communications to provide cable television or telecommunications companies with access to that space on a nondiscriminatory basis. *Id*. § 224(f)(1). A utility may only deny such entities access "on a non-discriminatory basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes." *Id.* § 224(f)(2).

Shortly after the passage of the 1996 Telecommunications Act, the FCC issued a series of regulations designed to implement the legislation. The bulk of the regulations, contained in the FCC's *First Report and Order*, addressed issues relating to the deregulation of local telephone exchanges. However, the *First*

---

[1]A number of new telecommunications entities had been seeking to attach their wires to utility poles for some time, but were not covered by the Pole Attachments Act. The 1996 Telecommunications Act added telecommunications carriers to the class of entities entitled to regulated rates for pole attachments, and granted them the same access rights given cable companies.

8

*Report and Order* also promulgated guidelines seeking to implement the 1996 Telecommunications Act's provisions modifying the Pole Attachments Act.[2] Petitioners filed petitions seeking reconsideration of some of the FCC's findings in the *Order*. After considering these requests for changes in the *First Report and Order*, the FCC issued its *Order on Reconsideration* in 1999. Petitioners brought the instant action objecting to the following determinations initially made in the *First Report and Order* and affirmed upon reconsideration:

(1) that the Act covers electric transmission facilities, as opposed to merely "any pole, duct, conduit, or right-of-way owned or controlled by [utilities]";

(2) that utilities must expand pole capacity to accommodate requests for attachment in situations where it is agreed that there is insufficient capacity on a given pole to permit third-party pole attachments;

(3) that utilities may not reserve available capacity on their facilities for future utility-related use unless the reservation is made pursuant to a bona fide development plan, and that utilities must permit use of such reserved space by third-party attachers until the utility has an "actual need" for the space;

---

[2]The Pole Attachments Act, as modified by the 1996 Telecommunications Act, will hereinafter be referred to as the "Act."

(4) that if the utilities use some of their poles, ducts conduits, and rights-of-way for wire communications services, the Act grants third-party attachers access to all of the utilities' poles, ducts, conduits, or rights-of-way;

(5) that the utilities may not limit those who place and maintain attachments on their poles to their own specially trained employees or contractors; and

(6) that the utilities must comply with a series of guidelines regarding notification to third-party attachers in the event a pole needs to be modified, and must bear certain costs associated with pole modifications.

We will discuss each of these objections in turn.

DISCUSSION

The FCC is charged with administering the Act, and the guidelines under review were promulgated pursuant to its interpretation of the Act. We therefore will review the FCC's interpretation of the statute using the two-step process first articulated in *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–45 (1984). *Chevron's* first step requires us to ascertain whether Congress has spoken unambiguously "to the precise question at issue." *Id.* at 842. If the language of the statute is unambiguous, we go no further, for we must give effect to clear congressional intent. *Id.* at 842–43. If, however, we determine that Congress's intent is ambiguous as to the question at issue, we must move on to the second step

10

of the *Chevron* test and ask whether the agency's interpretation of congressional intent is reasonable. *Id*. at 844. We must defer to an agency's reasonable interpretation of congressional intent. *Id*. at 844–45.

I.

Electric Transmission Facilities

We first consider whether the FCC exceeded its authority by asserting that the Act applies not just to the "poles, ducts, conduits, and rights-of-way owned or controlled by [utilities]," 47 U.S.C. § 224(f)(1), but to electric transmission facilities as well. Petitioners contend that the plain language of the Act limits its coverage to electric distribution facilities, and that the FCC acted ultra vires when it construed the Act as applying to electric transmission plant as well.[3] The FCC claims that the distinction between electric transmission facilities and electric distribution facilities is not as clear as petitioners suggest, and that petitioners' construction of the Act would thwart congressional intent by carving out an artificial exemption from the Act's coverage for any facility designated as containing "transmission" plant.

---

[3]The specific language of the FCC guideline to which petitioners object is the following: "electric transmission facilities are not exempted from the pole attachment provisions of section 224." *Order on Reconsideration*, 14 FCC Rcd. 18049, para. 27 (Oct. 20, 1999).

11

To ascertain whether the FCC's guideline is an acceptable construction of congressional intent, we will first need to assess the differences between a utility's transmission facilities and its distribution facilities. We then must consider the statutory language, and see whether the statute's text limits the application of the Act to a utility's distribution plant. We can then apply the *Chevron* test to the FCC guideline.

Petitioners argue that electric transmission facilities are entirely distinct from local distribution facilities and are outside of the purview of the FCC's regulatory authority. The distinction between the two types of facilities has been described by one state public service commission as follows:

> The operations of an electric utility can be separated into three major systems: production, transmission, and distribution. Transmission systems, which comprise the second major component of an electric utility, transmit large quantities of electrical energy over relatively long distances from generating stations to major load centers. Transmission systems consist of switching stations, substations, towers, conductors (wires), and rights-of-way.
> The third major component of an electric utility is the distribution system and is comprised of substations, underground cables, poles, overhead conductors, transformers, service drops, and meters that supply power to the customers.

*Re Conn. Light & Power Co.*, 92 P.U.R.4th 50, 58–61 (Conn. Dep't of Pub. Util. Control Mar. 23, 1988).

The important differences between electric transmission facilities and electric distribution facilities are reflected in the present regulatory scheme for electric utilities. Transmission systems generally transport energy in bulk across state lines, and the operation of these systems is subject to regulation by the Federal Energy Regulatory Commission (FERC) pursuant to the Federal Power Act. 16 U.S.C. § 824(b)(1). However, the Federal Power Act explicitly divests the FERC of regulatory jurisdiction "over facilities used for the generation of electric energy or over facilities used in local distribution." *Id*. This provision recognizes the essentially local character of distribution facilities and systems, as opposed to the primarily interstate character of electric transmission facilities. Regulation of the latter was to be implemented by the FERC, while regulation of the former was to be left primarily in the hands of state and local authorities. This bifurcated regulatory structure is indicative of the accepted and fundamental distinction between a utility's transmission plant and its distribution plant.

The FCC argues, however, that this distinction is not as clear as petitioners claim. Not all transmission facilities necessarily entail interstate transmission of energy. Section 824(b)(1) recognizes this fact, and divests the FERC of regulatory authority over facilities used "only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy

13

consumed wholly by the transmitter." *Id.* While "transmission" of electricity may generally be an interstate matter, there are clearly situations in which transmission takes place entirely within a state, outside of the jurisdiction of federal regulatory bodies.

Another reason that the distinction between distribution and transmission facilities is difficult to draw is that many poles have a shared purpose. The FCC found, and petitioners do not dispute, that a number of distribution poles are affixed with transmission conductors and other transmission plant. *See Br. of Pet'r Fla. Power & Light Co.* at 27. There are plainly instances where elements of the two segments of the electric industry are combined on one entity, such as a distribution pole.

Thus, the FCC argues that it is arbitrary and contrary to the statute to attempt to draw a hard distinction between "distribution" and "transmission" facilities. They found that the Act applies to any facility that can be used for wire attachments. *See Br. of Resp'ts* at 31. Our task is to assess whether this finding can be reconciled with the intent of the Act.

We begin our analysis with the text of the statute. The relevant language concerning the scope of the Act's coverage provides that "[t]he term pole attachment means any attachment by a cable television system or provider of

14

telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility." 47 U.S.C. § 224(a)(4). "Poles, ducts, and conduits" are regular components of local distribution systems and not interstate transmission systems. Indeed, the primary physical unit responsible for carrying transmission wire – towers – are notably absent from the definition of "pole attachment." This indicates to us that Congress intended the Act as a mechanism for regulating attachments on the utilities' distribution facilities, not their transmission facilities and systems.

This reading of the Act is strengthened by the presence of a reverse-preemption provision, codified at 47 U.S.C. § 224(c)(1), which removes the FCC's authority to regulate pole attachments in any place where a state has elected to do so. As states lack general regulatory authority over interstate transmission facilities, this language strongly suggests that the Act's coverage does not extend beyond local distribution facilities. The Senate Committee notes accompanying the Act lend credence to this interpretation of the Act's coverage:

> The committee considers the matter of CATV pole attachments to be essentially local in nature, and that the various state and local regulatory bodies which regulate other practices of telephone and electric utilities are better equipped to regulate CATV pole attachments. . . . It is only because such state or local regulation currently does not widely exist that federal supplemental regulation is justified.

15

S. Rep. No. 95-580, at 16-17 (1977), *reprinted in* 1978 U.S.C.C.A.N. 109, 124–25 (caps omitted).

The text of the statute, coupled with the presence of this reverse-preemption clause, make it plain that the Act's coverage was intended to be limited to the utilities' local distribution facilities, and was not to extend to the general regulation of interstate transmission towers and plant.

However, this does not mean that the FCC lacks the authority to regulate a pole that happens to contain transmission wire. The Act grants the FCC the power to regulate "poles, ducts, conduits, or rights-of-way," and does not limit the FCC's authority to those "poles, ducts, conduits, or rights-of-way" not used for the purposes of transmission.

Applying the *Chevron* test to the relevant FCC guideline, we find that the Act, when considered as whole, speaks precisely to the question at issue. Our inquiry is therefore complete after the first step of the *Chevron* test. The reverse-preemption clause, coupled with the absence of any textual reference to "towers" or other forms of transmission plant, indicates that Congress intended to limit the Act's application to local distribution facilities. Therefore, petitioners are correct that the scope of the Act, and of the FCC's regulatory power, does not extend to a utility's interstate electric transmission towers and facilities, which are regulated

by the FERC and are outside of the purview of the FCC's authority. To the extent that the FCC guideline suggests that the Act covers interstate transmission towers and facilities, it must be struck down, as it fails to effect the unambiguous intent of Congress.

However, the FCC is correct that the text of the Act clearly indicates that its coverage extends to any of a utility's "poles, ducts, conduits, or rights-of-way," so long as the utility (1) uses any of its "poles, ducts, conduits, or rights-of-way" for wire communications; and (2) the facility does not fall within one of the exceptions indicated in § 224(f)(2). The fact that a given "pole, duct, conduit, or right[]-of-way" may have some transmission plant attached to it does not exclude it from the coverage of the Act. These local distribution facilities, festooned as they may be with transmission wires, are plainly within the FCC's jurisdiction under the terms of the Act.

In sum, the plain language of the Act mandates the following: transmission towers and other interstate transmission facilities are not subject to the Act's provisions, and the FCC lacks the authority to regulate these facilities. However, the Act generally covers all "poles, ducts, conduits and rights-of-way," and these local distribution facilities are covered by the Act, regardless of whether they are used in part for transmission wires or other transmission facilities.

## II.

### Expansion of Capacity

In situations where it is agreed that capacity on a given pole or other facility is insufficient to accommodate a proposed attachment, the FCC orders require utilities to expand the capacity of their existing infrastructure at the request of attaching entities. Petitioners challenge this requirement as contrary to the express language of the Act. The challenged portion of the *Order on Reconsideration* reads as follows: "[T]he principle of nondiscrimination established by section 224 (f) (1) requires a utility to take all reasonable steps to expand capacity to accommodate requests for attachment just as it would expand capacity to meet its own needs." *Order on Reconsideration*, 14 FCC Rcd. 18049, para. 51 (Oct. 20, 1999).

Petitioners' challenge to this guideline is rooted in the text of § 224(f)(2). This clause provides that "a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way on a non-discriminatory basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes." 47 U.S.C. § 224(f)(2). Petitioners argue that this language speaks precisely to the question of whether utilities must expand the capacity of their plant

to provide access for potential attachers, and answers that question in the negative. The entire purpose of this section is to specify the exceptions to the general rule mandating that utilities provide cable and telecommunications companies nondiscriminatory access to their facilities; one of those exceptions is implicated when the facility contains "insufficient capacity." If utilities are required to expand the capacity of their plant at the request of a third party, "it is hard to see how you can give section 224 (f) (2) any meaning at all . . . ." *Order on Reconsideration*, 14 FCC Rcd. at 18099 (Powell, Comm'r, concurring in part and dissenting in part).

The FCC counters this argument by noting that many utilities now use their poles to support thriving telecommunications businesses of their own (ten of the thirteen petitioners own or have financial involvement in telecommunications businesses), and suggests that the nondiscrimination principle that motivated the 1996 Telecommunications Act mandates that the FCC prohibit a utility from "favor[ing] itself over other parties with respect to the provision of telecommunications or video programming services." *First Report and Order*, 11 FCC Rcd. 15499, para. 1157 (Aug. 1, 1996). The rule on expansion of capacity, according to the FCC, is simply one manner in which the FCC implements Congress's intent to prevent utilities from exploiting their monopoly ownership of

the necessary infrastructure to deny competitors access to their markets. The FCC merely mandates that utilities make room for third parties in the same manner in which they would if they needed additional space for their telecommunications operations.

The FCC's position is contrary to the plain language of § 224(f)(2). While the FCC is correct that the principle of nondiscrimination is the primary purpose of the 1996 Telecommunications Act, we must construe statutes in such a way to "give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted). Section 224(f)(2) carves out a plain exception to the general rule that a utility must make its plant available to third-party attachers. When it is agreed that capacity is insufficient, there is no obligation to provide third parties with access to that particular "pole, duct, conduit, or right-of-way." 47 U.S.C. § 224(f)(2). As Commissioner Michael Powell noted, it is hard to see how this provision could have any independent meaning if utilities were required to expand capacity at the request of third parties. The entire purpose of the section is to specify the conditions under which the general rules mandating access for third parties do not apply. By attempting to extend those generally applicable rules into an area where the statutory text clearly directs that they not apply, the FCC is subverting the plain meaning of the Act.

Therefore, our inquiry on this issue need not extend beyond the first step of the *Chevron* test. The FCC's attempt to mandate capacity expansion is outside of the purview of its authority under the plain language of the statute.

## III.

### Reserved Space

Petitioners object to the FCC's orders specifying the disposition of "reserved space" on a given pole or other utility-owned facility. The FCC acknowledges that utilities enjoy the right to reserve space on their facilities for their future use, in order to ensure the integrity and reliability of their core utility service. However, the FCC guidelines require that utilities seeking to reserve space on their facilities take two distinct steps to which they object. First, utilities may not reserve space for future use unless they do so pursuant to a "bona fide development plan that reasonably and specifically projects a need for that space in the provision of its core utility service." *First Report and Order*, 11 FCC Rcd. at para. 1169. Second, utilities must permit third parties to use reserved space until such time as the utility demonstrates an actual need for the reserved space. Petitioners claim that these requirements are contrary to the language and intent of the Act and, alternatively, are arbitrary and capricious exercises of the FCC's discretionary authority.

Petitioners once again rely upon the text of § 224(f)(2) to support their contention that the FCC's rule is contrary to statute. They argue that the language permitting utilities to deny access on the basis of "insufficient capacity" specifically entrusts the utilities with the power to determine when capacity is insufficient, and the FCC's rules limiting the utilities' ability to reserve capacity on their facilities removes this power from the utilities and places it in the FCC's hands. Utilities regularly reserve space on poles to ensure the reliability and safety of electric service, as well as for legitimate engineering purposes. Petitioners argue that requiring the utilities to justify their decision to reserve capacity for these purposes to the FCC gives the FCC a power completely outside of the realm of its expertise, and is contrary to the language and intent of the Act.

Petitioners further claim that the rule mandating that reserved space be offered to third parties until such time as it is actually needed by a utility is both contrary to § 224(f)(2) and blatantly unreasonable. Once again, petitioners argue that the plain language of § 224(f)(2) is contradicted when utilities are forced to provide space, even temporarily, for third-party attachers when the utilities have already determined (through the reservation of space) that capacity is insufficient. Also, as a practical matter, it will be extremely difficult to evict third parties using reserved space at the time a utility develops an actual need for the space. This

22

would risk disrupting existing cable television or telecommunications service and would be unlikely to receive FCC approval. Thus, petitioners claim that the FCC's rule foists an unworkable system onto the utilities with respect to their rights to reserve space on their facilities.

The FCC argues that its rules on reserved space are simply a mechanism for ensuring that the nondiscrimination principle is fully implemented. Its rules are a method of ensuring that the utilities do not reserve excessive space indefinitely in an effort to keep potential competitors from using their facilities. The FCC claims that the "bona fide development plan" rule is a reasoned mechanism to guarantee that utilities do not reserve space without legitimate purposes in mind. The "actual need" regulation is another reasonable manner of ensuring that utilities do not reserve space for extensive periods in an effort to deny attachers (and prospective competitors) the benefit of their infrastructure. The FCC asserts that both of these rules are simply ways of making sure that utilities that claim that "insufficient capacity" exists on their poles due to reserved space actually do lack the capacity on their poles based upon legitimate future needs, and are not simply attempting to reserve excessive space in order to thwart the interests of their competitors.

Applying the *Chevron* test to the FCC's guidelines, we find that the Act does not speak precisely to the question at issue; namely, how the term "insufficient

capacity" is to be defined. Nothing in the language of the statute specifies the conditions under which capacity should be deemed insufficient. Petitioners' construction of the Act, which claims that the utilities enjoy the unfettered discretion to determine when capacity is insufficient, is not supported by the Act's text. The language of § 224(f)(2) does not speak in such absolute terms; there are no suggestions, here or elsewhere in the Act, that utilities enjoy the right to reserve as much space as they wish for as long as they deem necessary, and on that basis, to deny cable companies attachments based upon a lack of capacity. In fact, the statute is silent on the scope and parameters of the term "insufficient capacity," and on the relationship between that term and the utilities' ability to reserve available space for future needs.

The absence of statutory language outlining this relationship is a gap in the statutory scheme. "From that gap springs executive discretion." *Gonzalez v. Reno*, 212 F.3d 1338, 1348 (11th Cir.), *cert. denied*, 530 U.S. 1270 (2000). *Chevron* mandates that we defer to a reasonable agency effort to fill the gaps in a given statutory scheme. 467 U.S. at 843–44. Therefore, we turn to step two of the *Chevron* test, which requires us to assess whether the FCC guidelines on reserved space are reasonable.

The FCC guideline requiring a "bona fide development plan" as a prerequisite to a utility's reservation of space for its future needs is a reasonable exercise of agency discretion. The FCC recognized that utilities enjoy the power to reserve space on their facilities for future utility-related needs. However, the FCC must have some way of assessing whether these needs are bona fide; otherwise, a utility could arbitrarily reserve space on a pole, claiming it necessary on the basis of unsupportable "future needs," and proceed to deny attachers space on the basis of "insufficient capacity." This is clearly not what Congress intended when it passed the Act; such a construction would undermine the plain intent of the nondiscrimination provisions found in § 224(f)(1). The FCC thus requires utilities to justify their need for any space they seek to reserve (and thus deny potential attachers) by demonstrating a bona fide future need for that space. This appears an eminently reasonable mechanism to ensure that when utilities reserve space on a pole and deny attachers access on the basis of insufficient capacity, capacity is actually insufficient. If in individual cases, the FCC unreasonably rejects a utility's legitimate reservation of space, the utilities are entitled to seek judicial review of that order.

The second FCC guideline under attack – allowing third parties to use reserved space until the utility demonstrates actual need – is another reasonable

effort to fill a gap in the statute. Reserved space on a given facility is not unusable in the short term. The FCC construed the term "insufficient capacity" to mean the actual absence of usable physical space on a pole. Reserved capacity is, temporarily at least, of use to attaching entities. All parties will presumably be aware of the temporary nature of this available space, and attachers will have to be prepared for potential disruptions that may occur when the utility demonstrates an actual need for the space. There is nothing unreasonable or arbitrary about this construction of the ambiguous term "insufficient capacity." Hence, it is entitled to deference under the terms of *Chevron*.

In conclusion, the FCC guidelines with respect to reserved space are reasonable constructions of an ambiguous statutory term. We therefore must accord those guidelines due deference.

IV.

Scope of Third-Party Access

Petitioners claim that the FCC exceeded its statutory authority when it found that the Act triggered access for third parties to all of a utility's "poles, ducts, conduits, and rights-of-way," regardless of whether those facilities are presently being used for wire communications. The challenged language in the *First Report and Order* reads: "We see no statutory basis . . . for the argument made by some

utilities that they should be permitted to devote a portion of their poles, ducts, conduits, and rights-of-way to wire communications without subjecting all such property to the access obligations of section 224 (f) (1)." *First Report and Order*, 11 FCC Rcd. at para. 1173.

The crux of petitioners' claim is their construction of the text of § 224(a)(1), which defines a "utility" as "any person . . . who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications." 47 U.S.C. § 224(a)(1). The utilities argue that this language demonstrates congressional intent to limit the Act's coverage to facilities already being used for wire communications.

Petitioners' argument is weak. The plain meaning of § 224(a)(1) is that a utility (for the purposes of the statute) is any entity that controls "poles, ducts, conduits, or rights-of-way" and uses some of those facilities for wire communications. The language does not limit the definition of a "utility" to an entity that uses <u>all</u> of its facilities for the purpose of wire communications; the lack of such limiting language leads to the natural inference that a utility is an entity that owns or controls <u>some</u> facilities used for that purpose.

Furthermore, the plain language of another part of the Act effectively forecloses petitioners' argument. Section 224(f)(1) provides that "[a] utility shall

provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it." *Id*. § 224(f)(1). This language plainly mandates that utilities make all of their "poles, ducts, conduits, or rights-of-way" available to third-party attachers (unless one of the exceptions listed in § 224(f)(2) applies), regardless of whether the facility is presently being used for telecommunications purposes. We have noted that "the adjective 'any' is not ambiguous; it has a well established meaning." *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1337 (11th Cir. 1999) (en banc) (internal quotation marks omitted). "Read naturally, the word 'any' has an expansive meaning . . . . [When] Congress [does] not add any language limiting the breadth of that word, . . . 'any' means 'all.'" *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997) (citation omitted) (internal quotation marks omitted). In this context, the lack of a limitation upon the adjective 'any' means that § 224(f)(1) expands the Act's coverage to all "poles, ducts, conduits, or rights-of-way owned or controlled by a utility."

Thus, we need not look beyond *Chevron*'s first prong on this issue. Congress has unambiguously stated that the Act's coverage extends to all "poles, ducts, conduits, or rights-of-way owned or controlled by a utility." The FCC

orders under challenge give this plain language effect, and therefore we cannot disturb the orders.

V.

Third-Party Workers

Petitioners argue that after an attaching entity is granted access to the utility's facilities, the utility should be able to limit those that perform attachment installation and maintenance to its own specially trained employees or designated independent contractors. Petitioners challenge the FCC guideline stating the following: "[A] utility may require that individuals who will work . . . in the proximity of electric lines . . . have the same qualifications, in terms of training, as the utility's own workers, but the party seeking access will be able to use any individual workers who meet these criteria." *Order on Reconsideration*, 14 FCC Rcd. at para. 86.

Petitioners argue that the rule goes beyond the statutory authority the FCC enjoys to regulate the "rates, terms, and conditions" of pole attachments. 47 U.S.C. § 224(b)(1). They argue that the statute does not give the FCC the authority to regulate the utility's employment practices, an area already regulated by other federal and state agencies. This position is shared by FCC Commissioner Harold W. Furchtgott-Roth, who stated in his dissent, "Put directly, I see nothing in

29

section 224 that gives this Commission authority to regulate the labor and employment practices of electric utilities. This is simply not a case of statutory ambiguity." *Order on Reconsideration*, 14 FCC Rcd. at 18097 (Furchtgott-Roth, Comm'r, concurring in part and dissenting in part).

Alternatively, petitioners contend that the rule is unreasonable. In order to work safely on electric facilities, personnel require a unique understanding of the dangers associated with performing construction, maintenance, or repair work in proximity to electric wires. Personnel having such skills are in short supply. According to petitioners, outside workers, regardless of their paper qualifications, likely will not be as capable as those that work day in and day out on these facilities for the utilities. In the case of utility employees, the utility is able to supervise the work, make competency determinations, and discipline employees when necessary. This is not the case with employees of third-party attachers. Petitioners claim that the ultimate result of the rule is unduly onerous to utilities, which must endure the dangers associated with less capable people working on their lines. Therefore, petitioners aver that the guideline must be struck down as capricious.

Applying the *Chevron* test to this guideline, we find that the statute does not speak unambiguously to the question at issue. There is no mention of the

30

qualifications of workers anywhere in the Act's text. However, the Act gives the FCC the power to regulate the "rates, terms and conditions" of pole attachments; the FCC argues that its regulations governing the qualifications of workers falls within the parameters of its authority to regulate the "conditions" of pole attachments. Absent some clear indication on the face of a statute that an agency lacks the authority to regulate a particular subject matter, "agencies have authority to fill gaps where the statutes are silent." *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, __ U.S. __, 122 S. Ct. 782, 789 (2002). The Act does not specify what sorts of concerns constitute the "conditions" of a pole attachment, and there is no statutory language suggesting that regulation of the physical process of attaching wires (by workers) is outside of the scope of the "conditions" of a pole attachment. Hence, we have a gap in the statutory scheme – the "conditions" of a pole attachment must be given some content. The gap in the statute means that Congress has not spoken unambiguously to the precise question at issue, and *Chevron* mandates that we must defer to a reasonable agency attempt to give effect to ambiguous congressional intent.

Looking at this second step of the *Chevron* analysis, we find the FCC's rule within the scope of its discretion. Once an attaching entity is granted access to a utility's facilities, the attacher must install its equipment on the utility's facilities

and perform maintenance on that equipment from time to time, and the FCC recognizes that forcing third-party attachers to use the utility's workers to construct and maintain the attachments would impede the attachers' access to the poles and lead to disputes over compensation, quality of work, and the like. The FCC's rule mandates that third-party workers have access to the poles in order to prevent these potential disputes, but permits utilities to set standards for those workers to ensure that they have the necessary qualifications. This guideline is a reasonable effort to regulate one of the fundamental "conditions" of a pole attachment – namely, the process by which an attachment is made and maintained. The guideline represents an attempt to balance the interests involved in a measured and reasonable way, and *Chevron* dictates that we accord it appropriate deference. We therefore decline to overturn the FCC's findings regarding the regulation of third-party workers.

## VI.

### Pole Modification

Petitioners dispute two additional sets of guidelines the FCC developed in interpreting § 224(h) of the Act, which provides,

> Whenever the owner of a pole, duct, conduit, or right-of-way intends to modify or alter such pole, duct, conduit, or right-of-way, the owner shall provide written notification of such action to any entity that has obtained an attachment to such conduit or right-of-way so that such entity may have a reasonable opportunity to add to or modify its existing attachment. Any entity that adds to or modifies its existing attachment after receiving such

32

notification shall bear a proportionate share of the costs incurred by the owner in making such pole, duct, conduit, or right-of-way accessible.

47 U.S.C. § 224(h).

Petitioners challenge the following three guidelines implementing this statutory provision:

(1) that absent a private agreement, utilities seeking to modify their poles or facilities must give the companies with attachments on that facility sixty days notice of the proposed modification;[4]

(2) that a utility that uses a request for modification from an attaching entity to bring its facilities into compliance with applicable safety or other regulatory guidelines will be responsible for its share of the modification costs; and

(3) that a utility will bear all of the costs of any government-mandated modification of a facility (such as road widening, etc.), as the utility would bear those costs even in the absence of any attachment to the facility.

Applying the *Chevron* test to each of these guidelines, we find that Congress has not spoken precisely to any of these questions. The Act mandates that attaching entities be given notice when a modification is to take place; the

---

[4]The guideline contains an exception for situations where sixty days notice would be impractical, and in such cases, simply requires the utilities inform attaching entities of proposed modifications "as soon as reasonably practicable." *Order on Reconsideration*, 14 FCC Rcd. at para. 89.

language does not specify the time frame for that notice.  The Act requires that each attaching entity pay a "proportionate" share of the costs an owner incurs in making its facilities available to them; the term "proportionate" is not defined in the text of the statute.  Therefore, we have  gaps in the statute with respect to the specifics of these issues, and we must defer to any reasonable agency efforts to fill these gaps.  *Chevron*, 467 U.S. at 843–44.

We find nothing capricious in the FCC's construction of § 224(h).  The sixty-day rule is a common-sense, flexible effort to implement the statute's notice requirement.  The second guideline, requiring that utilities bear a proportionate share of the costs associated with modernizing their plants pursuant to an attacher's request for a modification, is also reasonable.  As the utilities will be the primary beneficiaries of efforts to modernize their facilities, it is logical for the FCC to mandate that they bear some share of the costs of the transition.  Finally, it is reasonable to mandate that utilities bear the costs of modifying their facilities in response to local government mandates, given that they would bear these costs in any event.   Attaching entities are not given a free ride, as incremental costs associated with moving the attachment can be factored into the standard rent utilities charge to attachers.  *Order on Reconsideration*, 14 FCC Rcd. at para. 105.

In sum, the FCC's guidelines implementing § 224(h) are neither contrary to the statute nor unreasonable, and we therefore decline to disturb them.

CONCLUSION

In conclusion, we find that two of the FCC's guidelines implementing the 1996 amendments to the Act are contrary to the statutory language and must be overturned. First, the FCC exceeded its authority under the Act when it determined that interstate transmission towers and plant were subject to its regulatory authority. The Act's language and structure limit its coverage to "poles, ducts, conduits, and rights-of-way," which do not generally comprise part of a utility's transmission system. While the presence of transmission wires or other transmission facilities on "poles, ducts, conduits, or rights-of-way" does not divest the FCC of jurisdiction over those facilities, the FCC plainly has no jurisdiction over transmission towers or other transmission plant. Second, the FCC lacks the authority to order utilities to expand the capacity of their infrastructure to accommodate third-party attachers in situations where it is agreed that existing capacity is insufficient. With respect to all of the other guidelines under challenge, we decline to overturn the FCC's determinations.

SO ORDERED.