**SAC FINANCE, INC., Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–0702–TA–6.

Tax Court of Indiana.

Sept. 24, 2008.

Bradley Kim Thomas, Nathan D. Hoggatt, Thomas & Hardy, LLP, Auburn, F. Pen Cosby, Cremer & Cremer, Indianapolis, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Jennifer E. Gauger, Matthew R. Nicholson, Deputy Attorneys General, Indianapolis, IN, Attorneys for Respondent.

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

FISHER, J.

SAC Finance, Inc. (SAC) appeals from the final determination of the Indiana Department of State Revenue (Department) granting it a partial refund of state gross retail tax (sales tax) paid during the 2002 and 2003 tax years (the period at issue). The matter is currently before the Court on the parties' cross-motions for summary judgment. The issue for the Court to decide is whether SAC is entitled to the remainder of its requested sales tax refund pursuant to Indiana Code § 6–2.5–6–9.

### FACTS

The following facts are undisputed. Superior Auto is a used car dealership in Fort Wayne, Indiana. When a person purchases a vehicle from Superior Auto, Superior Auto typically finances the transaction through an installment contract. The amount financed includes the price of the vehicle and the sales tax imposed on the sale.

During the years at issue, Superior Auto sold many of its installment contracts to SAC.[1] Pursuant to their written agree-

---

1. "SAC [ ] and Superior Auto [ ] are related corporations. There are some common officers. The two corporations have common ownership. Some employees perform duties for both corporations." (Pet'r Designated Evid. Ex. C at 3.)

ments, Superior Auto assigned to SAC its rights and interests in the installment contracts. (See Pet'r Designated Evid. Ex. H ¶ 11.8, Ex. I ¶ 1.) In return, SAC agreed "to buy those consumer sales-finance accounts receivable contracts" for the purchase price of 70% of their balance. (See, e.g., Pet'r Designated Evid. Ex. H ¶ 1.)

Some of the vehicle purchasers ultimately defaulted on their contracts. As a result, in the Fall of 2004, SAC filed two claims with the Department seeking a refund of the Indiana sales tax that had been remitted on those now uncollectible receivables.[2] After conducting a refund investigation, the Department allowed 70% of SAC's combined refund claim; the Department denied the other 30% of the claim on the basis that it represented the "discount" SAC received when it purchased the installment contracts from Superior Auto.[3]

SAC initiated this original tax appeal on February 21, 2007. On January 9, 2008, the Department filed a motion for summary judgment. SAC filed a cross-motion for summary judgment on February 5, 2008. The Court conducted a hearing on the parties' motions on April 28, 2008. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

■ Summary judgment will be granted only if there are no genuine issues of material fact and the moving party is enti-

tled to judgment as a matter of law. Ind. Trial Rule 56(C). Cross-motions for summary judgment do not alter this standard. *Williams v. Indiana Dep't of State Revenue*, 742 N.E.2d 562, 563 (Ind. Tax Ct.2001).

## DISCUSSION AND ANALYSIS

Indiana imposes an excise tax, known as the state sales tax, on retail transactions made within the state. IND.CODE ANN. § 6-2.5-2-1(a) (West 2008). "The person who acquires property in a retail transaction is liable for the tax on the transaction and ... shall pay the tax to the retail merchant as a separate added amount to the consideration in the transaction." A.I.C. § 6-2.5-2-1(b). The retail merchant then remits the collected taxes to the Department on a monthly basis. IND. CODE ANN. § 6-2.5-6-1 (West 2008).

■ To determine how much sales tax it must remit each month, the retail merchant multiplies its gross retail income from taxable transactions made during that month by the applicable sales tax rate. See IND.CODE ANN. § 6-2.5-6-7 (West 2008). In so doing, however, Indiana Code § 6-2.5-6-9 allows the retail merchant to adjust for bad debts or uncollectible receivables.[4] During the years at issue, this statute provided:

> In determining the amount of [sales] tax[ ] which he must remit [to the State] ... a retail merchant shall deduct from

---

**2.** SAC's claim for the 2002 tax year sought a refund of $175,463; its claim for the 2003 tax year sought a refund of $195,739. (Pet'r Designated Evid. Exs. D, E.)

**3.** SAC states that the Department actually denied 47.4% of its requested refund. (See Pet'r Br. in Supp. of [its] Mot. for Summ. J. (hereinafter, Pet'r Br.) at 4 n. 7.) It appears that this is the result of the Department having reduced the gross refund amount (i.e., the 70%) by a collection allowance. (See Resp't Designated Evid. Ex. B at 6 ¶ 5.) SAC has not

challenged the propriety of this particular adjustment and, as a result, the Court expresses no opinion with respect thereto.

**4.** In other words, Indiana Code § 6-2.5-6-9 "provides tax relief to merchants who have financed the sales tax for installment contract purposes on which consumers later default." *Chrysler Fin. Co. v. Indiana Dep't of State Revenue*, 761 N.E.2d 909, 916 (Ind. Tax Ct.2002), *review denied*.

his gross retail income from retail transactions made during a particular reporting period, an amount equal to his receivables which:

(1) resulted from retail transactions in which the retail merchant did not collect the [sales] tax from the purchaser;

(2) resulted from retail transactions on which the retail merchant has previously paid the [sales] ... tax liability to the [D]epartment; and

(3) were written off as an uncollectible debt for federal tax purposes during the particular reporting period.

IND.CODE ANN. § 6–2.5–6–9(a) (West 2002). In calculating its sales tax deduction under this statute, a retail merchant (or its assignee [5]) is limited to the amount it wrote off as uncollectible debt for federal tax purposes. *See Indiana Dep't of Revenue v. 1 Stop Auto Sales, Inc.*, 810 N.E.2d 686, 690 (Ind.2004). Consequently, the issue in this case is how much SAC was allowed to write off as uncollectible debt for federal tax purposes. (*See* Resp't Br. in Supp. of [its] Mot. for Summ. J. (hereinafter, Resp't Br.) at 4–6 (where the Department maintains that, under federal law, SAC cannot

write off more than what it paid for the installment contracts); Pet'r Br. in Supp. of [its] Mot. for Summ. J. (hereinafter, Pet'r Br.) at 9–13 (where SAC maintains that federal law authorizes it to write off more than what it paid for the contracts).) [6] The Department is correct.

Section 166 of the Internal Revenue Code, entitled "Bad debts," allows a federal deduction against adjusted gross income for wholly or partially worthless debt. I.R.C. § 166(a) (2002). In turn, Treasury Regulation § 1.166–1(d) provides the following guidance as to the amount to be deducted:

(1) *General rule.* Except in the case of a deduction for a reasonable addition to a reserve for bad debts, the basis for determining the amount of deduction under section 166 in respect of a bad debt shall be the same as the adjusted basis prescribed by § 1.1011–1 for determining the loss from the sale or other disposition of property. To determine the allowable deduction in the case of obligations acquired before March 1, 1913, see also paragraph (b) of § 1.1053–1. (2) *Specific cases. Subject to any provision of section 166 and the regulations*

---

**5.** Under Indiana common law, a retail merchant's right to a sales tax deduction under Indiana Code § 6–2.5–6–9(a) is assignable. *See id.* at 912–13. Thus, the fact that Superior Auto assigned its right to a sales tax deduction under Indiana Code § 6–2.5–6–9(a) to SAC is not at issue in this case.

**6.** The Court notes that both parties' motions for summary judgment also make alternative arguments. The Department maintains that SAC actually was not entitled to a sales tax deduction under Indiana Code § 6–2.5–6–9(a) at all, as it "technically" did not write off any uncollectible debt for federal tax purposes on its federal tax returns. (*See* Resp't Br. in Supp. of [its] Mot. for Summ. J. (hereinafter, Resp't Br.) at 7–8 (explaining that for S-corporations such as SAC, a federal bad deduction is reported on line 10 of the Form 1120S;

SAC's Forms 1120S do not report any "Bad debt" deductions on line 10) (citing Pet'r Designated Evid. Exs. M, N)).) (*But see* Resp't Br. at 8 (where the Department stipulates that to the extent it already awarded SAC 70% of its claim, it "is not [now] seeking to recover the erroneously refunded amounts")).) SAC, on the other hand, argues that because the IRS never contested where it put its deduction, or the amount it actually deducted, neither the Department nor this Court has authority to do so now. (*See* Pet'r Br. at 6–9.) The Court rejects both arguments, however, as they merely elevate form over substance. *See Monarch Beverage v. Indiana Dep't of State Revenue*, 589 N.E.2d 1209, 1215 (Ind. Tax Ct.1992) (stating that Indiana determines tax consequences based on the substance, not the form, of a transaction).

*thereunder which provides to the contrary, the following amounts are deductible as bad debts:*

(i) Notes or accounts receivable. (a) If, in computing taxable income, a taxpayer values his notes or accounts receivable at their fair market value when received, the amount deductible as a bad debt under section 166 in respect of such receivables shall be limited to such fair market value even though it is less than their face value.

(b) *A purchaser of accounts receivable which become worthless during the taxable year shall be entitled under section 166 to a deduction which is based upon the price he paid for such receivables but not upon their face value.*

Treas. Reg. § 1.166–1(d) (2002) (emphases added).

Pursuant to section (d)(2)(i)(b), SAC is limited to writing off no more than what it paid for the installment contracts. Treas. Reg. § 1.166–1(d)(2)(i)(b).[7] Nevertheless, SAC argues that this limitation does not apply. More specifically, SAC argues that "the imperative, introductory language [of] § 1.166–1(d)(2) dictates that SAC [ ] follow the mandates of § 1.166–1(d)(1) as [it] is clearly 'a regulation to the contrary' of § 1.[1]66–1(d)(2)." (Pet'r Br. at 10–11.) The Court disagrees.

■ Given that this case involves the interpretation of a federal law, the United States Supreme Court's rules for statutory construction apply. That Court has held that the foremost goal in statutory construction is to determine and implement the legislature's intent in enacting that statutory provision, the best evidence of which is found in the actual language of the statute itself. *See BedRoc Ltd. v. U.S.,*

541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (stating that "[t]he preeminent canon of statutory interpretation 'presume[s] that [the] legislature says in a statute what it means and means in a statute what it says there' " (internal quotation marks and citation omitted)). To that end, meaning must be given to each and every word used in a statute, as it will not be presumed that the legislature intended to enact a statutory provision that is superfluous, meaningless, or a nullity. *See U.S. v. Powers,* 307 U.S. 214, 217, 59 S.Ct. 805, 83 L.Ed. 1245 (1939) (stating that a statute should not be construed in such a manner as to render it partly ineffective) (citation omitted). Moreover, when a statute contains both a specific provision and a general one, the specific provision will control; the general provision will be taken to affect only such cases within its general language as are not within the provisions of the particular provision. *Nat'l Cable & Telecomm. Ass'n v. Gulf Power Co.,* 534 U.S. 327, 335–36, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002).

■ SAC's position contravenes these very rules of statutory construction. First, SAC's claim that the introductory language of the specific provision (i.e., § 1.166–1(d)(2)) dictates that it use the general provision (i.e., § 1.166–1(d)(1)) necessarily renders the specific provision meaningless. Indeed, under SAC's logic, the specific rule relating to bad debt on notes and accounts receivable would never apply because it would always be "trumped" by the general provision of § 1.166–1(d)(1). The Court will not presume the legislature intended such an absurd result; rather, it will presume that the legislature intended the introductory language of the special provision to be

**7.** *See also* I.R.S. Publication 535 (2007) (stating that "[i]f you purchased an account receivable for less than its face value, and the receivable subsequently becomes worthless, the most you are allowed to deduct [under I.R.C. § 166] is the amount you paid to acquire it").

applied logically and in a way that would not bring about such an absurd result. Consequently, the Court concludes that the introductory language of § 1.166–1(d)(2) refers only to those "provisions of § 166 and the regulations thereunder" *which relate to the calculation of bad debt on notes and accounts receivable* and that are contrary to the specific rules provided in (d)(2)(i).[8]

## CONCLUSION

Based on the foregoing reasons, SAC cannot write off as bad debt more than what it actually paid for the installment contracts at issue. As a result, summary judgment is GRANTED in favor of the Department and AGAINST SAC. The parties shall bear their own costs.

---

**8.** SAC also attempts to convince the Court that the specific provision is completely inapplicable in this case because "[f]or accounting purposes, SAC [ ] treats the purchased installment contracts as promissory notes [and not as accounts receivable]." (Pet'r Br. at 11 n. 32.) SAC's argument, again, merely elevates form over substance. *See* n. 6, *supra*. *(See also* Pet'r Designated Evid. Ex. H ¶ 1 (wherein SAC agreed "to buy [Superior Auto's] consumer sales-finance accounts receivable contracts" for $0.70 on the dollar).)