ATTORNEYS FOR PETITIONER:
**MARK J. RICHARDS**
**MATTHEW J. EHINGER**
ICE MILLER, LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**THEODORE E. ROKITA**
ATTORNEY GENERAL OF INDIANA
**LYDIA A. GOLTEN**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

INDIANA FINANCE FINANCIAL CORP., )
)
    Petitioner, )
)
        v. ) Case No. 20T-TA-00017
)
INDIANA DEPARTMENT OF STATE )
REVENUE, )
)
    Respondent. )

FILED

Jan 04 2024, 3:40 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## ORDER ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**FOR PUBLICATION**
**January 4, 2024**

WENTWORTH, Special J.

Indiana Finance Financial Corp. appeals the Indiana Department of State Revenue's denials of its sales tax refund claims for the 2017 and 2018 tax years. The matter is currently before the Court on the parties' cross-motions for summary judgment.[1] Upon review, the Court grants summary judgment in favor of Indiana Finance with respect to its original refund claims.

---

[1] The parties have designated evidence that contains confidential information. Accordingly, the Court will provide only that information necessary for the reader to understand its disposition of the issues presented. See Ind. Access to Court Records Rule 9(A)(2)(d) (2024).

## FACTS AND PROCEDURAL HISTORY

The following facts are not in dispute. During the years at issue, Oak Motors, Inc. operated car dealerships in Indiana. (See Joint Stipulation of Facts ("Jt. Stip.") ¶ 2.) In selling its cars, Oak Motors regularly executed installment sale contracts to finance all or a part of its customers' purchase prices and the applicable sales tax. (See Jt. Stip. ¶ 2.) Oak Motors then remitted sales tax on the full price of the cars to the Department. (Jt. Stip. ¶ 2.)

Oak Motors subsequently sold its installment sale contracts and assigned all its rights and obligations thereunder to its affiliate, Indiana Finance.[2] (See Jt. Stip. ¶¶ 1-2.) Indiana Finance purchased the installment sale contracts without recourse for 65% or 70% of the original amount financed. (See Jt. Stip. ¶ 2.) That is, Indiana Finance purchased the installment sale contracts at a 30% or 35% discount from their face values.[3] (Jt. Stip. ¶ 2.) At some point thereafter, several of Indiana Finance's customers defaulted on their contracts. (See Jt. Stip. ¶ 3.)

When customers defaulted on their installment sale contracts, Indiana Finance repossessed the customers' cars and sold them either at auction or directly to Oak Motors. (See Jt. Stip. ¶¶ 3-4.) Indiana Finance used the auction proceeds to establish the fair market value of the repossessed vehicles sold at auction; Indiana Finance used

---

[2] Oak Motors and Indiana Finance are members of an "affiliated group" within the meaning of Indiana Code § 6-2.5-6-9(c) because "the same persons own more than 50 percent in value of the outstanding stock of each [S-]corporation." (See Joint Stipulation of Facts ("Jt. Stip.") ¶ 1.) See also IND. CODE § 6-2.5-6-9(c) (2017); I.R.C. § 267(b)(11) (2017).

[3] For simplicity, the Court will refer to all the installment sale contracts at issue as though they were purchased at 70% of the originally financed amount, representing a 30% discount from their face values. This reference therefore applies as well to the installment sale contracts that were actually purchased at a 35% discount.

the Manheim Market Report ("MMR")[4] to establish the fair market value of the repossessed vehicles sold to Oak Motors. (Jt. Stip. ¶ 4.) Additionally, Indiana Finance received various third-party payments related to the resolutions of insurance and warranty claims on an unspecified number of the repossessed vehicles. (See Jt. Stip. ¶ 3.)

On its 2017 and 2018 federal and Indiana income tax returns, Indiana Finance claimed a deduction for bad debts on the defaulted contracts calculated according to IRC § 166. (See Pet'r Des'g Evid., Ex. 1 ("Pretorius Aff.") ¶¶ 6, 9; Jt. Stip. ¶ 5.) Additionally, Indiana Finance sought a refund of the Indiana sales tax, previously paid by Oak Motors to the Department, that became an uncollectible receivable for Indiana Finance following the customer defaults. (See Jt. Stip. ¶¶ 6, 15, Exs. A, K.) Indiana Finance maintained that its Indiana bad debt calculation was consistent with this Court's decision in SAC Finance, Inc. v. Indiana Department of State Revenue (SAC II), 24 N.E.3d 541 (Ind. Tax Ct. 2014), review denied. (See, e.g., Jt. Stip. ¶ 6, Ex. A at SOF-9.)

Indiana Finance applied the Market Discount Rules (i.e., the rules under IRC §§ 1276 through 1278) to the value of repossessed vehicles, insurance claim payments, and warranty claim payments (collectively, the "Repossessed Property") in the same way it did to installment payments. (See, e.g., Jt. Stip. ¶¶ 3-6, Ex. A at SOF-9; Pretorius Aff. ¶¶ 5-9.) Accordingly, Indiana Finance increased its basis in the installment sale contracts by the market discount recognized in gross income (specifically, 30% of the receipts representing the discount from the contracts' face value and constituting Indiana Finance's taxable profit), and it decreased its basis in these contracts by 100%

---

[4] The Manheim Market Report ("MMR") is "the premier indicator of wholesale [vehicle] prices, updated daily." (Jt. Stip. ¶ 4.)

of all payments made.  (See Pretorius Aff. ¶ 5.)  The net effect of this federal treatment is that the market discount portion of a payment is taxable as income (profit) and the remainder is a non-taxable reduction in basis.  (See Pretorius Aff. ¶ 5.)

Upon review, the Department accepted the portion of Indiana Finance's bad debt calculations that reflected the federal market discount treatment for installment payments, but rejected the same treatment for Repossessed Property, claiming that Indiana Finance was required to reduce its unpaid balances in the defaulted contracts by 100% of the value of the Repossessed Property.  (See Jt. Stip. ¶¶ 7, 17, Exs. B, M; Pretorius Aff. ¶¶ 14, 24.)  In other words, the Department denied that part of Indiana Finance's two refund claims that applied the Market Discount Rules to the Repossessed Property, thereby reducing the uncollectible amount by only 70%, rather than the full 100% of the Repossessed Property's value.  (See Jt. Stip. ¶¶ 7, 17, Exs. B, M; Pretorius Aff. ¶¶ 14, 24.)

Indiana Finance protested the Department's partial denials of its refund claims. (See Jt. Stip. ¶¶ 8, 18, Exs. C, N.)  During the protest proceedings, the Department asserted that Indiana Finance should have removed the entire amount of the Repossessed Property.  (See Jt. Stip. ¶ 9, Ex. D; Pretorius Aff. ¶ 14.)  Indiana Finance disagreed, explaining that if it excluded the entire amount of the Repossessed Property, its basis would not decrease by virtue of the receipt of the Repossessed Property, and its basis in the contracts would exceed that in its refund claims, leading to a larger sales tax refund than it requested.  (See Jt. Stip. ¶ 9, Ex. D; Pretorius Aff. ¶ 16.) Subsequently, the Department denied Indiana Finance's protest in its entirety.  (See Jt. Stip. ¶ 10 Ex. E; Pretorius Aff. ¶ 17.)

4

Indiana Finance requested a rehearing with the Department.  (See Jt. Stip. ¶ 12, Ex. G; Pretorius Aff. ¶ 19.)  In addition, Indiana Finance filed two supplemental refund claims for the 2017 and 2018 tax years that recalculated its bad debt deductions as specified by the Department.  (See Jt. Stip. ¶¶ 11, 16, Exs. F, L; Pretorius Aff. ¶¶ 18, 23.)

The Department granted Indiana Finance's request for rehearing, but denied Indiana Finance's two supplemental refund claims because they did not reduce the bad debt deduction by the value of the Repossessed Property.  (See Jt. Stip. ¶¶ 14, 19, 21, Exs. I, O, Q; Pretorius Aff. ¶¶ 21, 28.)  Consequently, the Department recalculated Indiana Finance's adjusted tax basis by reducing the unpaid balances of its defaulted contract receivables by the full value of the Repossessed Property.  (See, e.g., Jt. Stip. ¶¶ 7, 14, 17, 21.)[5]

Indiana Finance protested the complete denials of its supplemental refund claims.  (See Jt. Stip. ¶¶ 14, 21, Exs. J, R.)  On January 14, 2020, the Department conducted an administrative hearing on all outstanding matters, and subsequently concluded Indiana Finance was not entitled to any additional relief.  (See Jt. Stip. ¶¶ 22-25, Exs. S, T.)

On October 21, 2020, Indiana Finance initiated this original tax appeal,

---

[5] The Department's designated evidence includes a spreadsheet with examples of the parties' three different bad debt calculations:  the Department's calculation and Indiana Finance's original and supplemental calculations.  (See Resp't Mot. Summ. J. & Des'g Evid. ("Resp't Des'g Evid."), Ex. 5.)  Both parties agree that the spreadsheet's mathematical calculations in the examples are accurate.  (See Hr'g Tr. at 121-23.)  Nonetheless, the terminology that describes the calculation steps differs significantly from the terminology used in the parties' summary judgment materials.  (Compare, e.g., Resp't Des'g Evid., Ex. 5 with Br. Supp. Pet'r Mot. Summ. J. ("Pet'r Br.") at 2-13 and Resp't Mem. Law Supp. [Resp't] Mot. Summ. J. ("Resp't Br.") at 2-9.)  Accordingly, the spreadsheet is of limited value to the Court.

challenging the Department's denials of $163,044.00 in sales tax from its original refund claims and $258,584.00 in sales tax from its supplemental refund claims. (See Resp't Mot. Summ. J. & Des'g Evid. ("Resp't Des'g Evid."), Ex. 1 ¶¶ 15, 18, 25-26; Jt. Stip. ¶ 26.) The parties filed their cross-motions for summary judgment on June 18, 2021. The Court held a hearing on the parties' cross-motions on August 31, 2021. Additional facts will be supplied if necessary.

## STANDARD OF REVIEW

The Tax Court reviews final determinations of the Department de novo. IND. CODE § 6-8.1-9-1(c) (2024). Accordingly, the Court is not bound by the evidence presented or the issues raised during the administrative proceedings. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied. The Court will grant a motion for summary judgment only when the designated evidence demonstrates that no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). Cross-motions for summary judgment do not alter the standards for determining whether summary judgment is warranted. Horseshoe Hammond, 865 N.E.2d at 727.

## LAW

During the years at issue, Indiana imposed a sales tax (i.e., the state gross retail tax) on retail transactions made in Indiana. IND. CODE § 6-2.5-2-1(a) (2017) (amended 2017). Generally, the person acquiring the property in a retail transaction was liable for the tax and paid the tax to the retail merchant as a separate added amount to the consideration in the transaction. I.C. § 6-2.5-2-1(b).

The retail merchant collected the sales tax as an agent for the state and remitted

6

the collected taxes to the Department on a monthly basis. IND. CODE § 6-2.5-6-1(a) (2017). The retail merchant was required to remit the entire amount of sales tax due during the reporting period in which a retail transaction occurred, even if, as here, an item's sales price and related sales tax had been financed over time. See IND. CODE § 6-2.5-6-7 (2017) (indicating that retail merchants are liable for the difference between what they were supposed to collect in sales tax during a reporting period and what they actually collected). To determine the amount of sales tax to remit each month, the retail merchant multiplied its gross retail income from taxable transactions made during that month by the applicable sales tax rate. See I.C. § 6-2.5-6-7. See also IND. CODE § 6-2.5-1-5 (2017) (defining "gross retail income") (amended 2019).

Indiana Code § 6-2.5-6-9 (the "Indiana Bad Debt Statute"), however, allowed a retail merchant (or its assignee) to deduct from the amount of sales tax due, the tax due on the amount of its receivables written off as uncollectible debt for federal income tax purposes under IRC § 166:

> (a) In determining the amount of [sales] and use taxes which a retail merchant must remit under section 7 of this chapter, the retail merchant shall, subject to subsections (c) and (d), deduct from the retail merchant's gross retail income from retail transactions made during a particular reporting period, an amount equal to the retail merchant's receivables which . . . were written off as an uncollectible debt for federal tax purposes under Section 166 of the Internal Revenue Code during the particular reporting period.

IND. CODE § 6-2.5-6-9(a) (2017) (emphasis added). The Indiana Bad Debt Statute further explained:

> (d) The following provisions apply to a deduction for a receivable treated as uncollectible debt under subsection (a):
>
> (1) The deduction does not include interest.

7

(2) The amount of the deduction shall be determined in the manner provided by Section 166 of the Internal Revenue Code for bad debts but shall be adjusted to exclude:

    (A) financing charges or interest;

    (B) sales or use taxes charged on the purchase price;

    (C) uncollectible amounts on property that remain in the possession of the seller until the full purchase price is paid;

    (D) expenses incurred in attempting to collect any debt; and

    (E) repossessed property.

I.C. § 6-2.5-6-9(d) (emphases added) ("Subsection (d)").  Thus, the Indiana Bad Debt Statute provided tax relief to retail merchants (or their assignees) that financed the sales tax for installment contract purchases on which consumers later defaulted.  SAC Fin., Inc. v. Indiana Dep't of State Revenue (SAC II), 24 N.E.3d 541, 547 (Ind. Tax Ct. 2014), review denied; Chrysler Fin. Co. v. Indiana Dep't of State Revenue, 761 N.E.2d 909, 916 (Ind. Tax Ct. 2002), review denied.

Nearly twenty years ago, the Indiana Supreme Court was asked to determine whether an auto dealership that financed its customers' vehicle purchases, including the related sales tax, was required to deduct the total amount of repossessed collateral under the Indiana Bad Debt Statute.  See Indiana Dep't of State Revenue v. 1 Stop Auto Sales, Inc., 810 N.E.2d 686, 686-88 (Ind. 2004).  Although the Indiana Bad Debt Statute did not include Subsection (d) during the 1993 through 1997 tax years then at issue, the Indiana Supreme Court recognized that the calculations for an Indiana bad debt deduction must use the mathematics of IRC § 166, which incorporates other

8

sections of the Internal Revenue Code. See id. at 689; IND. CODE § 6-2.5-6-9 (2004) (amended 2007). Consequently, the Indiana Supreme Court held that the auto dealership could deduct only that portion of its receivables equal to the amount written off for federal income tax purposes because "the Legislature intended that only the net debt that is unable to be collected may be deducted" (the "Net Debt Principal"). See 1 Stop Auto Sales, 810 N.E.2d at 686 (emphasis added).

Over the years, this Net Debt Principle has been instrumental in determining whether a taxpayer's bad debt deduction was proper. See, e.g., SAC II, 24 N.E.3d at 543-48 (explaining that the use of the Market Discount Rules to calculate the Indiana bad debt deduction prevents writing off more than what was actually paid for the uncollectible receivables); SAC Fin., Inc. v. Indiana Dep't of State Revenue (SAC I), 894 N.E.2d 1116, 1121 (Ind. Tax Ct. 2008) (holding that a taxpayer could not write off as bad debt more than it actually paid for its installment contracts), review denied. Mindful of the Net Debt Principle, therefore, the statutory exclusions in Subsection (d) cannot be applied in a manner that allows a taxpayer to write off more than the amount it actually paid for its uncollectible debt.

**ANALYSIS**

This case examines how the Indiana Bad Debt Statute treats Repossessed Property. Indiana Finance claims it is entitled to summary judgment on its two original refund claims because it recognized the use of the Market Discount Rules in its Indiana

bad debt deductions by excluding 70% of the face value of the Repossessed Property.[6]
(See, e.g., Br. Supp. Pet'r Mot. Summ. J. ("Pet'r Br.") at 14-21, 23-24.)

Indiana Finance asserts that it properly excluded Repossessed Property in its two original refund claims, as required under Subsection (d), by reducing its adjusted basis in the installment contracts by the value of the Repossessed Property, except for the value attributed to market discount income. (See Pet'r Br. at 20; Pet'r Br. Resp. [Resp't Br.] ("Pet'r Resp. Br.") at 2-12.) In other words, 70% of the value of Repossessed Property decreased Indiana Finance's adjusted basis in its installment contracts while the remaining 30%, the market discount income, did not.

The Department asserts, on the other hand, that Subsection (d) required Indiana Finance to reduce its adjusted basis by subtracting the full amount of the Repossessed Property, not merely a fraction of it. (See Resp't Mem. Law Supp. [Resp't] Mot. Summ. J. ("Resp't Br.") at 11-37; Resp't Mem. Law Opp'n Pet'r Mot. Summ. J. ("Resp't Resp. Br.") at 10-26.) The Department reasons that (1) the Market Discount Rules apply only to installment payments, not Repossessed Property, and (2) that SAC II may not be relied on because it was wrongly decided and should be overruled. (See, e.g., Resp't Br. at 14-15, 25-37.)

### (1) Repossessed Property

The Department contends that Indiana Finance erred in applying the Market Discount Rules to its Repossessed Property because they apply solely to installment

---

[6] Alternatively, Indiana Finance claims that it is entitled to summary judgment on its supplemental refund claims because the Indiana Bad Debt Statute did not require it to include any portion of the Repossessed Property in its bad debt calculations. (Compare, e.g., Pet'r Br.at 21-22 with Resp't Br. at 33-37.) The Court will not address these claims, however, as it has resolved this appeal on other grounds.

payments.  (See Resp't Br. at 11-15.)  The Department explains that

> [w]hen [Indiana Finance] repossesses and resells a vehicle, it is
> paid the value of the repossessed vehicle from a third party (either
> a third party at auction or Oak Motors), it is not paid that value from
> a customer. . . . The fact is, when [Indiana Finance] repossesses a
> vehicle from a defaulting customer, it is making a recovery on an
> account that, going forward, will [be] treated as worthless.  [Indiana
> Finance] does not receive a principal payment during this recovery
> process – the last principal payment [Indiana Finance] truly
> received was the last payment the defaulting customer actually
> paid.

(Resp't Br. at 14.)  (See also Resp't Resp. Br. at 16-19; Resp't Reply Br. Supp. Mot.

Summ. J. ("Resp't Reply Br.") at 5-6.)  The Department argues that SAC II supports its

position that Repossessed Property and installment payments must be treated differently

because "'the portion of each installment payment [paid by a customer] characterized as

market discount income for federal income tax purposes is income that has actually been

paid to SAC [and not taken by SAC].'"[7]  (Resp't Br. at 5 (quoting SAC II, 24 N.E.3d at

547.)  The Department's focus on the difference between installment payments, made by

customers, and Repossessed Property, recovered from third parties, is a red herring and

does not justify different treatment under the Market Discount Rules.

How value is received is immaterial; what is relevant is that value is accounted

for in the same way under the mathematics of IRC § 166.  See Treas. Reg. § 1.1272-

1(g).  The federal Market Discount Rules are part of the mathematics of IRC § 166.  See

SAC II 24 N.E.3d at 544.  But, IRC § 166 and its regulations do not explicitly state that

Repossessed Property must be treated the same as installment payments.  See, e.g.,

---

[7]  Although the Department "quotes" SAC II, its additions in brackets mislead the reader
because the additions do not accurately reflect the language in SAC II.  See SAC Fin., Inc. v.
Indiana Dep't of State Revenue (SAC II), 24 N.E.3d 541, 547 (Ind. Tax Ct. 2014) (stating that
"[m]oreover, the portion of each installment payment characterized as market discount income
for federal income tax purposes is income that has actually been paid to SAC"), review denied.

11

I.R.C. § 166 (2017); Treas. Reg. §§ 1.166-1 to -10. Even so, the logic of similar treatment is inescapable.

Acknowledging that its original refund claim calculations do not reflect a literal reading of Subsection (d) to exclude Repossessed Property, Indiana Finance insists its calculations reflect Subsection (d)'s spirit and intent, as recognized by this Court in SAC II, to follow the mechanics of IRC § 166 on all payments it received. (See Pet'r Br. at 20.) Indiana Finance explains this interpretation is logical because it avoids the absurd result of reducing sales tax refunds by the market discount income portion of the Repossessed Property. (See Pet'r Br. at 20-21.) The Court agrees. To find otherwise would set the Net Debt Principle on its head. Indiana Finance paid 70% of face value for the defaulted contracts. If the basis in those contracts were also reduced by market discount income (the profit from the transaction between Oak Motors and Indiana Finance), there is a substantial possibility that Indiana Finance would not receive a refund attributable to what it had paid. Accordingly, adjusting Indiana's bad debt amount to subtract market discount income, amounts Indiana Finance never paid, is contrary to the Net Debt Principle.

Moreover, the Department contends that the value of the Repossessed Property cannot be treated like an installment payment because it is paid by a third party. (See Resp't Br. at 14-15.) The Department's distinction is meaningless, however, because it has been long held that a payment made by a third party may discharge another's underlying obligation. See e.g., 13 Corbin on Contracts § 67.3 n.1 (2023) (indicating that an insurance company payment discharged husband's obligation to pay former wife's car loan balance); id. at § 70.6 ("A performance rendered by the third person that

12

is bargained for and received by the claimant in satisfaction of the claim operates as a discharge of the debtor"); id. ("A discharge of the original obligation also ensues from a part payment made in some medium of money other than that originally called for in the agreement").

Finally, Indiana Finance prepared its federal and state income tax returns treating installment payments and Repossessed Property in the same manner. (See, e.g., Pretorius Aff. ¶¶ 5-9.) The federal tax treatment is significant here because the Indiana Bad Debt Statute "only requires that the bad debt be deducted for federal income tax purposes, not that the taxpayer demonstrate the validity of the deduction." SAC II, 24 N.E.3d at 545 (quotation omitted).

For these reasons, the Court does not find the Department's arguments persuasive that Repossessed Property should have been treated differently than installment payments under the federal Market Discount Rules and Subsection (d) merely because they were made by third parties during the recovery process. Accordingly, the Department has not shown it is entitled to summary judgment on this basis.

### (2) SAC II

The Department claims to be entitled to summary judgment on the alternative theory that the Court wrongly decided SAC II and, therefore, should overrule the holdings that Market Discount Rules apply to Repossessed Property under the Indiana Bad Debt Statute and that market discount income is included in the write-off for a bad debt deduction. (See Resp't Br. at 25-26; Hr'g Tr. at 102-07.) In its motion, the Department asks the Court to overrule SAC II for two reasons.

13

First, the Department claims that <u>SAC II</u> is a "Pandora's box" that must be closed because IRC § 166(e) and IRC § 165(g)(2)(C) show that the Market Discount Rules do not apply to the calculation of a bad debt deduction at all.  (<u>See</u> Resp't Br. at 25-26; Resp't Resp. Br. at 20-21; Hr'g Tr. at 70-71.  IRC § 166(e) states that it does not "apply to a debt which is evidenced by a <u>security</u> as defined in" IRC § 165(g)(2)(C).  I.R.C. § 166(e) (emphasis added).  In turn, IRC § 165(g)(2)(C) defines a "security" as "a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form."  I.R.C. § 165(g)(2)(C) (2017).  Elaborating, the Department explains

> [w]hether thought of as bonds under the [Market Discount Rules] themselves . . . or as "other evidence of indebtedness," [Indiana Finance's] installment [sale] contracts with its customers are "securities" within the meaning of [IRC § 165(g)(2)(C)].  As a consequence, the market discount income portion of [Indiana Finance's] uncollectible installment [sale] contracts cannot be deducted under [IRC § 166] and, thereby, are excluded from the computational starting point for [an Indiana bad debt deduction].

(Resp't Resp. Br. at 21.)  (<u>See also</u> Resp't Br. at 25-26.)

While the Court does not suggest that the quality of a legal argument is directly proportionate to its length, there is a minimum threshold that must be crossed to adequately support a contention in the context of summary judgment.  Here, the Department's short, conclusory argument is neither supported by evidence nor fulfills the requirements of Trial Rule 56.  Specifically, the Department provided no evidence to show whether <u>interest coupons</u> were attached to Indiana Finance's installment sale contracts because none of the installment sale contracts were designated as evidence.  (<u>See</u> Resp't Des'g Evid.; Resp't Des'g Evid. Opp'n Pet'r Mot. Summ. J.; Resp't Des'g Evid. Further Supp. [Resp't] Mot. Summ. J.)  <u>See also</u> BLACK'S LAW DICTIONARY 443

14

(11th ed. 2019) (defining an "interest coupon" as "[a]n interest or dividend certificate that is attached to another instrument, such as a bond, and that may be detached and separately presented for payment of a definite sum at a specified time"). In addition, the Department failed both to explain the meaning of the statutory term "in registered form" and to explain whether Indiana Finance's installment sale contracts were "in registered form." (See Resp't Br. at 25-26; Resp't Resp. Br. at 20-21; Resp't Reply Br. at 13-14.)

Just as important, IRC § 165(g)(2)(C) requires a security (e.g., a bond) to be issued by a corporation, government, or political subdivision of a government. See I.R.C. § 165(g)(2)(C). Under this statute, an issuer of a bond or other evidence of indebtedness is commonly understood to be the borrower, not the lender. See, e.g., Treas. Reg. § 1.165-5(j) at Example 3 (indicating that the issuer of registered bonds was the corporation responsible for paying the bonds upon maturity). See also, e.g., Treas. Reg. § 1.446-5 (providing certain rules for allocating "costs incurred by an issuer of debt (that is, a borrower)" that must be capitalized over the term of the debt) (emphasis added). The undisputed material facts in this case establish that Oak Motors was the lender because it "financed all or a part of the cost of [the customers'] automobiles, including the sales tax on the purchase price of the automobiles, pursuant to [the] installment sale contract[s]." (Jt. Stip. ¶ 2.) Consequently, Indiana Finance's installment sale contracts are not securities under IRC § 165(g)(2)(C) because the facts show that the installment sale contracts were "issued" by the lender (i.e., Oak Motors), not the borrowers (i.e., the customers). (Jt. Stip. ¶ 2.) Accordingly, the Department's IRC § 166(e) and IRC § 165(g)(2)(C) argument does not show that the holding in SAC II was wrong or that it should be overruled.

15

Next, the Department claims that <u>SAC II</u> should be overruled because including market discount income in the computational starting point for Indiana's bad debt calculation inadvertently allows taxpayers like Indiana Finance to claim bad debt deductions for amounts greater than their uncollectible debts. (<u>See</u> Resp't Br. at 26-33; Resp't Resp. Br. at 20-26; Resp't Reply Br. at 11-13.) The Department argues that this result not only conflicts with Subsection (d), but also distorts the very meaning of a "tax write-off." (<u>See</u> Resp't Br. at 26-33; Resp't Resp. Br. at 20-26; Resp't Reply Br. at 11-13.) The Department explains that these consequences flow from recognizing market discount income in the computational starting point because

> [alt]hough [Indiana Finance] is <u>entitled</u> to [receive] 100% of the payments specified in its [installment sale] contracts, it does not stand in the shoes of Oak Motors; [Indiana Finance] cannot lose that which it was never paid. [Indiana Finance] effectively lent 65% to 70% of the value of the used vehicles to its customers – so, in cases of default, [Indiana Finance] is only harmed in an amount equal to what it outlaid, i.e., 65% to 70% of the value of its installment [sale] contracts.

(Resp't Br. at 32.) <u>See also</u> <u>SAC II</u>, 24 N.E.3d at 544-45 (explaining that under the first part of the Indiana bad debt calculation, the taxpayer/assignee must determine the computational starting point for the deduction, <u>i.e.,</u> the amount to be written off as an uncollectible debt for federal income tax purposes under IRC § 166). The Department's claim is not persuasive, however, for two reasons.

First, the Department has not directed the Court to any evidence, precedent, or persuasive authority to support its claim that Indiana Finance "effectively lent 65% to 70% of the value of the used vehicles to its customers" by virtue of purchasing the installment sale contracts from Oak Motors at a discount. (<u>See</u> Resp't Br. at 32-33; Resp't Reply Br. at 16-17.) Indeed, none of the evidence indicates that the transactions

16

between Indiana Finance and Oak Motors altered the substance of the transactions between Oak Motors, its customers, and the Department. Consequently, nothing indicates that the price Indiana Finance paid to Oak Motors for the installment sale contracts was related to or altered the amount of sales tax Oak Motors financed and then remitted to the Department. (See Jt. Stip. ¶¶ 1-2 (indicating that Oak Motors assigned all its rights and obligations under the installment sale contracts to Indiana Finance).) See also Chrysler Fin. Co., 761 N.E.2d at 914 (stating the well-settled principle of contract law is that "'a valid assignment gives the assignee neither greater nor lesser rights than those held by the assignor'") (citation omitted).

Second, because the Department's argument implicates only the computational starting point of the bad debt calculation, it invites the Court to determine the validity of Indiana Finance's federal bad debt calculations and corresponding deductions. (See, e.g., Hr'g Tr. at 82-87 (asserting that the Market Discount Rules do not apply to the calculation of the bad debt deduction under IRC § 166).) The Court has repeatedly explained, and has stated supra, that this type of argument is unavailing because the Indiana Bad Debt Statute "only requires that the bad debt be deducted for federal income tax purposes, not that the taxpayer demonstrate the validity of the [federal income tax] deduction." Chrysler Fin. Co., 761 N.E.2d 916 n.17 (emphasis omitted); see also SAC II, 24 N.E.3d at 545. Consequently, the Department's unsupported arguments and invitations to scrutinize the validity of Indiana Finance's federal income tax calculations and deductions do not persuade the Court to overrule its own precedent and grant summary judgment to the Department. Rather, the Court finds that Indiana Finance is entitled to summary judgment with respect to its original refund claims that

17

calculated its bad debt deductions under the Indiana Bad Debt Statute for the years at issue by excluding only the portion of the Repossessed Property that was not market discount income.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Indiana Finance's motion for summary judgment with respect to its original refund claims only. The Court therefore remands the matter to the Department for action consistent with this opinion.

SO ORDERED this 4th day of January 2024.

Martha Blood Wentworth
Special Judge, Indiana Tax Court

Distribution:
Mark J. Richards, Matthew J. Ehinger, Lydia A. Golten